## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| BILLITTERI v. SECURITIES AMERICA, INC., et al (Provident Royalties Litigation) | 3:09-CV-01568-f AND RELATED CASES |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS......................................................................................2

   A.   The Provident Securities............................................................................3

   B.   Defendants' Offer and Sale of the Provident Securities to Plaintiffs and
       Class Members ..........................................................................................4

   C.   Provident Royalties Files for Bankruptcy..................................................5

ARGUMENT ........................................................................................................6

   I.    LEGAL STANDARD .......................................................................................6

     A.   Motions to Dismiss Are Disfavored and All Allegations Must Be Accepted
        As True....................................................................................................6

     B.   Plaintiffs' Claims Do Not Sound In Fraud and Are Not Subject to Rule 9(b)........8

        1.    Plaintiffs Do Not Allege that Defendants Acted Fraudulently ..................8

        2.    Rule 9(b) Does Not Apply to Plaintiffs' TSA Article 581-33 Claims ......10

        3.    Rule 9(b) Does Not Apply to Plaintiffs' Breach of Fiduciary
            Duty Claim........................................................................................12

   II.   PLAINTIFFS HAVE SUFFICIENTLY PLED A CLAIM UNDER TSA
      ARTICLE 581-33..................................................................................13

     A.   Plaintiffs' Allegations Satisfy Rule 8 and, Although Not Required,
        Also Satisfy Rule 9(b)..........................................................................13

     B.   TSA Article 581-33 Holds All Sellers "In The Chain" Liable and Does Not
        Require that Defendants "Make" the False or Misleading Statements.................15

   III.  THE MATERIAL MISSTATEMENTS AND OMISSIONS IN THE PPMs ARE
      ACTIONABLE ....................................................................................18

     A.   The Bespeaks Caution Doctrine Does Not Apply to Plaintiffs' Claims...............19

     B.   The Alleged Material Misstatements and Omissions in the PPMs Are Neither
        Forward-Looking Statements Nor Statements of Future Performance ................21

     C.   The PPMs Did Not Include the Required Meaningful Cautionary Language ......27

     D.    Plaintiffs Have Satisfied Any Requirement that They Allege Fraudulent
          Intent by the Speaker ........................................................................................29

IV.   PLAINTIFFS HAVE ALLEGED A BREACH OF FIDUCIARY DUTY
      CLAIM AGAINST THE BROKER DEFENDANTS................................................31

V.    PLAINTIFFS HAVE ALLEGED CONTROL PERSON LIABILITY
      AGAINST  THE CONTROL PERSON DEFENDANTS..........................................38

VI.   PLAINTIFFS REQUEST LEAVE TO AMEND ANY PORTION OF
      THE COMPLAINT THAT IS DISMISSED BY THE COURT ................................45

CONCLUSION ........................................................................................................................46

## TABLE OF AUTHORITIES

### CASES

*Abbott v. Equity Group, Inc.*,
   2 F.3d 613 (5th Cir. 1993)..................................................................................40

*Abetter Trucking Co. v. Arizpe*,
   113 S.W.3d 503 (Tex. App. 2003)......................................................................37

*Aegis Ins. Holding Co. v. Gaiser*,
   No. 04-05-00938, 2007 WL 906328 (Tex. App. Mar. 28, 2007)..........................17

*Am. Realty Trust, Inc. v. Hamilton Lane Advisors, Inc.*,
   115 Fed. Appx. 662 (5th Cir. 2004)....................................................................10

*Am. Realty Trust, Inc. v. Travelers Cas. and Surety Co.*,
   362 F. Supp. 2d 744 (N.D. Tex. 2005)..............................................................9, 15

*Anderson v. Vinson Exploration, Inc.*,
   832 S.W.2d 657 (Tex. App. 1992)....................................................................11, 13

*Anixter v. Home-Stake Prod. Co.*,
   77 F. 2d 1215 (10th Cir. 1996)...........................................................................17

*Anton v. Merrill Lynch*,
   36 S.W.3d 251 (Tex. App. 2001).........................................................................33

*Apollo Property Partners, LLC v. Newedge Fin., Inc.*,
   No. H-08-1803, 2009 WL 778108 (S.D. Tex. Mar. 20, 2009)..............................34

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009).....................................................................................2, 7

*Barnes v. SWS Fin. Serv., Inc.*,
   97 S.W.3d 759 (Tex. App. 2003).............................................................39, 40, 45

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007).........................................................................................2, 7

*In re BP Prudhoe Bay Royalty Trust Sec. Litig.*,
   C06-1505, 2007 WL 3171435 (W.D. Wash. Oct. 26, 2007)..................................42

*Brody v. Zix Corp.*,
   No. 3:04-CV1931-K, 2006 WL 2739352 (N.D. Tex. Sept. 26, 2006)....................10

*Brown v. Whitcraft,*
   No. 3:08-CV-0186-D, 2008 WL 2066929 (N.D. Tex. May 15, 2008) .................................... 12

*In re Charter Commc'ns., Inc.,*
   443 F.3d 987 (8th Cir. 2006) ....................................................................................... 16

*City of Driscoll v. Saenz,*
   No. C-06-543, 2007 WL 173232 (S.D. Tex. Jan. 17, 2007) .................................................... 12

*Collmer v. U.S. Liquids, Inc.,*
   268 F. Supp. 2d 718 (S.D. Tex. 2003) ............................................................................ 22

*Copland v. Grumet,*
   No. Civ.A. 96-3351, 1998 WL 256654 (D.N.J. Jan. 9, 1998) .................................................. 45

*Covenant Capital Partners v. Soil Savers, Inc.,*
   No. 3:06-CV-0399-O, 2008 WL 2941125 (N.D. Tex. July 30, 2008) .................................... 17

*Crescendo Inv., Inc. v. Brice,*
   61 S.W.3d 465 (Tex. App. 2001) .................................................................................. 17

*de Kwiatkowski v. Bear, Stearns & Co., Inc.,*
   306 F.3d 1293 (2d Cir. 2002) ....................................................................................... 36

*Dennis v. Gen. Imaging, Inc.,*
   918 F.2d 496 (5th Cir. 1990) ....................................................................................... 40

*Dorsey v. Portfolio Equities, Inc.,*
   540 F.3d 333 (5th Cir. 2008) ............................................................................... 10, 29, 30

*Duperier v. Texas State Bank,*
   28 S.W.3d 740 (Tex. App. 2000) .............................................................................. 17, 19

*Dussouy v. Gulf Coast Inv. Corp.,*
   660 F. 2d 594 (5th Cir. 1981) ....................................................................................... 46

*In re Dynegy, Inc. Sec. Litig.,*
   339 F. Supp. 2d 804 (S.D. Tex. 2004) ............................................................................ 45

*Edward D. Jones & Co. v. Fletcher,*
   975 S.W.2d 539 (Tex. 1998) ....................................................................................... 36

*In re Enron Corp. Sec., Derivative & ERISA Litig.,*
   No. MDL 1446, H-01-3624,  2004 WL 3410449 (S.D. Tex. Apr. 6, 2004) ...................... 41, 44

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
   258 F. Supp. 2d 576 (S.D. Tex. 2003) ........................................................... 38

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
   No. MDL 1446, H-01-3624, 2005 WL 1637914 (S.D. Tex. June 20, 2005) ......................... 38

*In re Enron Corp. Sec., Derivative & Erisa Litig.*,
   235 F. Supp. 2d 549 (S.D. Tex. 2002) ...................................................... *passim*

*Erickson v. Pardus*,
   551 U.S. 89 (2007) ............................................................................. 7

*Escalon v. World Group Sec., Inc.*,
   No. 5:07-CV-214-C, 2008 WL 5572823 (N.D. Tex. Nov. 14, 2008) ................................. 31

*Floyd v. CIBC World Markets, Inc.*,
   No. H-08-3048, 2009 WL 2633791 (S.D. Tex. Aug. 25, 2009) ...................................... 42

*Frank v. Bear, Stearns & Co.*,
   11 S.W.3d 380 (Tex. App. 2000) ............................................................... 39

*G.A. Thompson & Co., Inc. v. Partridge*,
   636 F.2d 945 (5th Cir. 1981) ............................................................. 40, 41

*Gant v. State*,
   814 S.W.2d 444 (Tex. App. 1991) .............................................................. 18

*In re General Motors ERISA Litig.*,
   No. 05-71085, 2006 WL 897444 (E.D. Mich. Apr. 6, 2006) ....................................... 12

*In re Global Crossing, LTD Sec. Litig.*,
   No. 02 Civ. 910(GEL), 2005 WL 1875445 (S.D.N.Y. Aug. 5, 2005) ................................ 44

*Gochnauer v. A.G. Edwards & Sons, Inc.*,
   810 F.2d 1042 (11th Cir. 1987) ............................................................... 34

*Goldman v. Belden*,
   754 F.2d 1059 (2d Cir. 1985) ................................................................. 20

*Gonzalez v. Morgan Stanley Dean Witter, Inc.*,
   No. SA-03-CA-901, 2004 U.S. Dist. LEXIS 26709 (July 12, 2004) ....................... 38, 40, 44

*Grotjohn Precise Connexiones Int'l, S.A. v. JEM Fin., Inc.*,
   12 S.W.3d 859 (Tex. App. 2000) ............................................................... 11

*Grumman Allied Indus. v. Rohr Indus., Inc.*,
   748 F.2d 729 (2d Cir. 1984) ................................................................. 28

*Haggerty Partners P'ship v. Livingston*,
   128 S.W.3d 416 (Tex. App. 2004) ......................................................... 40

*Hand v. Dean Witter Reynolds Inc.*,
   889 S.W.2d 483 (Tex. App. 1994) ......................................................... 31

*Harden v. Raffensperger, Hughes & Co.*,
   65 F.3d 1392 (7th Cir. 1995) ...................................................... 23, 26, 30

*Herrington v. Household, Int'l, Inc.*,
   No. 02 C 8257, 2004 WL 719355 (N.D. Ill. Mar. 31, 2004) .................. 11

*Herrmann Holdings Ltd. v. Lucent Tech., Inc.*,
   302 F.3d 552 (5th Cir. 2002) .............................................. 14, 29, 30, 31

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
   86 F. Supp. 2d 481 (E.D. PA. 2000) ..................................................... 11

*Kennard v. Indianapolis Life. Ins. Co.*,
   420 F. Supp. 2d 601 (N.D. Tex. 2006) ............................................... 9, 10

*Kinzbach Tool Co. v. Corbett-Wallace Corp.*,
   160 S.W.2d 509 (Tex. 1942) ................................................................. 33

*Krim v. BancTexas Group*,
   989 F.2d 1435 (5th Cir. 1993) ...................................................... 21, 27, 28

*Kurtzman v. Compaq Computer Corp.*,
   No. Civ. A.H-99-779, 2000 WL 34292632 (S.D. Tex. Dec. 12, 2000) ................. 20, 21, 22, 28

*Lange v. H. Hentz & Co.*,
   418 F. Supp. 1376 (N.D. Tex. 1976) ..................................................... 34

*Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   461 F. Supp. 951 (E.D. Mich. 1978) ..................................................... 34

*Lexington Ins. Co. v. North American Interpipe, Inc.*,
   No. H-08-3589, 2009 WL 1750523 (S.D. Tex. June 19, 2009) ............... 37

*Lindelow v. Hill*,
   No. 00 C  3727, 2001 WL 830956 (N.D. Ill. July 20, 2001) ............... 23, 30

*Lone Star Ladies Inv. Club v. Shlotzsky's Inc.*,
   238 F.3d 363 (5th Cir. 2001) ................................................................. 9, 12

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ................................................................... 6, 7

*Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc.*,
   794 F.2d 198 (5th Cir. 1986) ................................................................ 31, 33

*Manufacturers Hanover Trust Co. v. Yanakas*,
   7 F.3d 310 (2d Cir. 1993) ........................................................................ 28

*Melder v. Morris*,
   27 F.3d 1097 (5th Cir. 1994) ................................................................. 9, 12

*In re: Merck & Co., Inc. Sec. Litig.*,
   432 F.3d 261 (3d Cir. 2005) ..................................................................... 21

*Millcreek Assocs. v. Bear Stearns & Co.*,
   205 F. Supp. 2d 664 ........................................................................... 19, 29

*Moore v. Kayport Package Express, Inc.*,
   885 F.2d 531 (9th Cir. 1989) .................................................................... 17

*Navigant Consulting, Inc. v. Wilkinson*,
   508 F.3d 277 (5th Cir. 2007) .................................................................... 37

*Peters v. Metro. Life Ins. Co.*,
   164 F. Supp. 2d 830 (S.D. Miss. 2001) ...................................................... 12

*Pollack v. Laidlaw, Holdings, Inc.*,
   No. 90 Civ 5788 (BAC), 1995 WL 261518 (S.D.N.Y May 3, 1995) .................... 44

*In re Rea*,
   245 B.R. 77 (Bankr. N.D. Tex. 2000) ......................................................... 33

*R2 Inv. v. Phillips*,
   No. Civ. A. 302CV0323N, 2003 WL 22862738 (N.D. Tex. Mar. 26, 2003) ......... 18

*Rogers v. Baxter Int'l, Inc.*,
   417 F. Supp. 2d 974 (N.D. Ill. 2006) ......................................................... 12

*Romano v. Merrill Lynch, Pierce, Fenner & Smith*,
   834 F.2d 523 (5th Cir. 1987) ........................................................ 31, 33, 36

*Rubinstein v. Collins,*
20 F.3d 160 (5th Cir. 1994) ............................................................................ 19, 20, 27, 28

*Scheuer v. Rhodes,*
416 U.S. 232 (1974) ............................................................................................................ 7

*Securities and Exchange Comm'n v. Tambone,*
No. 07-1384, 2010 WL 796996 (1st Cir. Mar. 10, 2010) ..................................................... 16

*Starr v. !hey,*
No. 01 C 6087, 2003 WL 21212596 (N.D. Ill. May 23, 2003) .............................................. 45

*Tapia v. Chase Manhattan Bank, N.A.,*
No. EP-93-CA-334-F, 1997 U.S. Dist. LEXIS 232108 (W.D. Tex. May 9, 1997)................. 35

*Tapia v. Chase Manhattan Bank, N.A.,*
149 F.3d 404 (5th Cir. 1998) .............................................................................................. 36

*Tarica v. McDermott Int'l,*
No. Civ. A., 99-3831, 2000 WL 1346895 (E.D. La. Sept. 19, 2000) ..................................... 35

*Texas Capital Mgmt. v. Sandefer,*
80 S.W.3d 260 (Tex. App. 2002).................................................................................. 40, 44

*Texas Capital Sec., Inc. v. Sandefer,*
58 S.W.3d 3d 760 (Tex. App. 2001).............................................................................. 17, 18

*The Jordan (Bermuda) Inv. Co. v. Hunter Green Inv. LLC,*
No. 00-9214, 2007 WL 2948115 (S.D.N.Y. Oct. 3, 2007) ................................................... 17

*Thompson v. Vinson & Elkins,*
859 S.W.2d 617 (Tex. App. 1993)....................................................................................... 37

*Timberlake v. Synthes Spine, Inc.,*
No. V-08-4, 2010 WL 743927 (S.D. Tex. Feb. 25, 2010) ..................................................... 46

*Trendsetter Inv., LLC, v. Hyperdynamics Corp,*
No. H-06-0746, 2007 WL 172627 (S.D. Tex. Jan. 18, 2007) ............................... 10, 39, 41, 44

*Trenholm v. Ratcliff,*
646 S.W.2d 927 (Tex. 1983) ............................................................................................... 24

*Wagner v. First Horizon Pharm. Corp.,*
464 F. 3d 1273 (11th Cir. 2006) ............................................................................................ 9

*West v. Touchstone,*
    620 S.W.2d 687 (Tex. App. 1981)......................................................................31

*Western Reserve Life Assur. Co. v. Graben,*
    233 S.W.3d 360 (Tex. App. 2007)....................................................................36

*Williams v. WMX Tech., Inc.,*
    112 F. 3d 175 (5th Cir. 1997) ...........................................................................9

*Wright v. Ernst & Young LLP,*
    152 F.3d 169 (2d Cir. 1998) ............................................................................16

*Zagami v. Natural Health Trends Corp.,*
    540 F. Supp. 2d 705 (N.D. Tex. 2008)............................................................45

*Zuckerman v. Foxmeyer Health Corp.,*
    4 F. Supp. 2d 618 (N.D. Tex 1998) ................................................................19

## STATUTES

15 U.S.C. § 77z-2(b)(2)(D) ....................................................................................21

15 U.S.C. § 77z-2(i)(1) ..........................................................................................22

## PRELIMINARY STATEMENT

This investor class action focuses on Defendants' liability in connection with the offer and sale of Provident Securities[1] to Plaintiffs and Class members. Plaintiffs allege three claims: violation of Article 581-33A(2) of the Texas Securities Act (the "TSA") against the Broker Defendants for the offer or sale of Provident Securities by means of a materially misleading Private Placement Memorandum; breach of fiduciary duty against the Broker Defendants for their failure to conduct due diligence and sale of unsuitable securities; and secondary liability against the Control Person Defendants under Article 581-33F of the TSA.

Faced with the well-pled allegations of the elements of these causes of action in the Complaint, Defendants seek to impose various pleading burdens and add elements to Plaintiffs' claims that have no legal justification under either the Federal Rules of Civil Procedure or Texas law. Contrary to Defendants' arguments, none of Plaintiffs' claims alleges any "fraudulent" misconduct by the Defendants, and none of the elements of those claims requires Plaintiffs to plead fraud or fraudulent intent in order to recover. In addition, Article 581-33A(2) imposes liability on those who offer or sell securities "by means of" a misleading statement – no requirement for "making" a misstatement is in the statutory language, and Defendants are wrong to suggest that it is an element of the claim. Plaintiffs' allegations are plausible on their face and easily satisfy the pleading standards of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009).

---

[1]  Unless otherwise noted, all defined terms in the Consolidated Amended Class Action Complaint (Docket No. 22) (the "Complaint") are adopted herein.

Defendants try to construct a defense to Plaintiffs' claims by characterizing certain of the allegedly false or misleading statements as "forward-looking" or "promises" of future performance. Those arguments must be rejected. First, any determination of those issues requires resolution of an issue of fact, which is inappropriate on a Rule 12(b)(6) motion. Second, the Complaint alleges misstatements and omissions of material facts that existed at the time the statements were made, not projections or future estimates. Third, Texas law has not adopted the "bespeaks caution" doctrine, but, even under federal authority, the purportedly "cautionary" language Defendants identify was too generic and boilerplate to shield them from liability.

Defendants' argument that they owed no fiduciary duty to Plaintiffs beyond the purely ministerial processing of Plaintiffs' investments ignores the facts and applicable law. Defendants expressly assumed a due diligence obligation to investors (for which they were paid a percentage of the investment proceeds), and Texas law imposes certain fiduciary obligations on brokers which Plaintiffs adequately allege have been breached.

Finally, the TSA explicitly provides for secondary liability against those who control, directly or indirectly, the primary wrongdoers. Each of the parent companies of the Broker Defendants are alleged to have the requisite indicia of control person status, and they should not be dismissed at this early stage of the litigation.

## STATEMENT OF FACTS

Provident Royalties is a Texas-based company that holds oil and gas interests, working interests and royalty interests in oil and gas properties in the United States. (¶¶ 1, 51.)[2] Beginning in September 2006, Provident Asset Management, LLC ("PAM"), a registered broker-dealer, together with a network of affiliated broker-dealers that included the Broker Defendants,

---

[2]   All "¶" citations are to the Complaint.

offered and sold to investors approximately $485 million of oil and gas investments in a series of Offerings.  (¶¶ 1, 52, 68.)  By the time the investments were revealed to be a Ponzi scheme in early 2009, the broker-dealers had earned approximately $69 million in fees—in part for "due diligence" they purportedly performed before selling the investments to Plaintiffs and Class members.  (¶¶ 2, 10, 68.)

A.      **The Provident Securities**

Provident Royalties and PAM raised funds from investors through a series of Offerings of preferred stock or partnership interests that promised a high rate of return—ranging from 14-18% per year—payable in the form of regular dividends or distributions.  (¶¶ 2, 53, 70-73.)  The securities were not publicly traded and were sold as exempt from the registration requirements of the Securities Act of 1933 (the "Securities Act") under SEC Rule 506 of Regulation D.  (¶¶ 1, 53.)  Each Offering was structured in a similar manner involving the sale of interests in a separate "Provident" or "Shale" entity (*e.g.*, Provident Resources 1, LP; Provident Energy 1, LP; Shale Royalties II, Inc.).  (¶¶ 1, 53-55.)  Provident Royalties was a beneficial owner in each of these Rule 506 Entities.  (¶¶ 1, 51, 60.)

Each of the Offerings was ostensibly offered and sold to "accredited" investors pursuant to a Private Placement Memorandum ("PPM").  (¶¶ 2, 69.)  The PPMs for all of the Offerings were substantially similar.  (¶¶ 69, 74.)  The PPMs stated the percentage of Offering proceeds that would be invested in the oil and gas business.  (¶¶ 3, 74-78.)  For example, the PPM for Shale 12 stated that 86% of the proceeds was designated for oil and gas investments, with the remainder used to pay organizational expenses (0.5%), syndication fees (4.5%) and commissions/due diligence fees (9%).  (¶ 77.)  In addition to setting forth a highly attractive rate of return, the PPMs included information about significant dividends paid in earlier Offerings.

3

(¶¶ 55, 82.) For example, the chart included as an exhibit to the PPM for Shale 20 shows that approximately $17 million had been paid out to investors in the early Offerings. (¶ 82.)

What the PPMs misstated was how Provident Royalties was using investors' funds. The various Provident Entities engaged in overlapping business and financial activities through an interconnected network of partnerships, companies, stockholdings and other relationships. (¶¶ 43-54, 58-62.) The Provident Entities did not invest the proceeds as represented, engaged in dozens of undocumented inter-company transfers, commingled the proceeds from the various Offerings, and used later investors' funds to pay "dividends" and "returns of capital" to earlier investors. (¶¶ 4, 63, 79, 81-92, 94-96.) As proceeds came in, the Provident Entities transferred assets and funds from one entity to another to pay dividends and make it appear that earlier investors were being paid returns on their investments. (¶¶ 86, 92.) In fact, earlier investors, who had been told that roughly 86 percent of their funds would be invested in oil and gas assets, were paid returns with the funds from later investors. (¶ 92.) For example, in October 2007, $2.2 million was transferred from a Shale 5 bank account to a Shale 4 bank account, and a portion of those funds were used to pay dividends to Shale 4 investors. (¶ 86.)

### B. Defendants' Offer and Sale of the Provident Securities to Plaintiffs and Class Members

The Broker Defendants were part of the syndicate of broker-dealers across the country that solicited the sale of and sold Provident Securities. (¶¶ 2, 9, 66, 69, 106.) The Broker Defendants executed participation agreements with PAM and attended sales presentations in PAM's offices, at PAM's expense. PAM also employed wholesalers that assisted the Broker Defendants with product training through workshops and conference appearances. (¶¶ 66-67.) The Broker Defendants participated in the drafting, preparation, approval, due diligence and/or dissemination of the PPMs. (¶¶ 2, 9, 64.)

4

The Broker Defendants were paid commissions and fees for selling the Provident securities, including a "due diligence" fee of 1% of the proceeds.  (¶¶ 2, 10, 64, 68.)  The PPMs explicitly stated that the Broker Defendants were paid this due diligence fee.  For example, the PPM for Shale 12 stated:

> Sales Commissions and Due Diligence Fees.  The Corporation will pay an 8% sales commission plus a 1% due diligence fee on the amount of subscription proceeds for Preferred Stock Series A to the Managing Dealer.  The Corporation will pay a 6% sales commission plus a 1% due diligence fee on the amount of subscription proceeds for the Preferred Stock Series B to the Managing Dealer.  The amount reflected above assumes that only Preferred Stock Series A is sold in this offering.  The Managing Dealer will pay the sales commission and due diligence fee to other securities broker/dealers for subscriptions received through such broker/dealers.

(¶ 10.)  An identical or virtually identical statement was included in the PPMs for the other offerings.  (¶ 10.)

### C.    Provident Royalties Files for Bankruptcy

In early 2009, the house of cards began to fall.  On January 22, 2009, Provident Royalties announced that it would no longer accept any new investors.  (¶¶ 5, 119.)  A week later, Provident Royalties suspended dividends and payments to all investors in the Offerings.  (¶¶ 5, 119.)  By then, Provident Royalties owed investors at least $10,130,785, with nearly $200 million more coming due in 2009.  (¶¶ 97, 120.)

On June 22, 2009, Provident Royalties and approximately 26 affiliated and related companies filed petitions in the United States Bankruptcy Court for the Northern District of Texas (Dallas Division) seeking relief under Chapter 11 of the United States Bankruptcy Code.  (¶¶ 6, 123.)

On July 1, 2009, the SEC filed civil fraud charges against Provident Royalties and its principals, alleging that Provident Royalties made a series of fraudulent securities offerings involving oil and gas investments.  (¶¶ 7, 124.)  The court-appointed receiver has concluded that

the Offerings were based on false and misleading representations to investors.   The Receiver's

First Quarterly Report, filed on October 30, 2009, stated that:

> At this stage, PAM has equitable disgorgement and fraudulent conveyance claims
> with regard to the approximately $69 million in broker commissions that were
> paid in the course of the fundraising herein.   **It is inescapable that there were
> significant, material misrepresentations made in the course of the offerings in
> this case**, and accordingly such commissions are avoidable.

(¶ 8, emphasis added.)

Plaintiffs filed this class action on behalf of all investors who purchased or acquired

Provident Securities from September 1, 2006 until January 31, 2009 from any of the Broker

Defendants (the "Class").   Plaintiffs assert a claim under Article 581-33A(2) of the TSA against

the Broker Defendants, who offered or sold the Provident Securities by means of the materially

false and misleading PPMs.   (¶¶ 134-39.)   Plaintiffs assert a claim against the Control Person

Defendants under Article 581-33F(1) of the TSA because they exercised control over the

management, policies and operations of their subsidiary brokers, and had the ability to prevent

their subsidiary brokers from acting as sellers of the Provident Securities.   (¶¶ 140-43.)   Plaintiffs

also allege that the Broker Defendants breached their fiduciary duties to Plaintiffs and the Class

by failing to perform a reasonable due diligence on behalf of investors to ensure that the

statements contained in the PPMs were true and not misleading and that the Provident Securities

were suitable investments for Plaintiffs and the Class.   (¶¶ 11, 65, 106-18, 144-49.)

## ARGUMENT

## I.      LEGAL STANDARD

### A.      Motions to Dismiss Are Disfavored and All Allegations Must Be Accepted As True

"Motions to dismiss under Rule 12(b)(6) 'are viewed with disfavor and are rarely

granted.'"   *Lormand v. US Unwired, Inc.*, 565 F. 3d 228, 232 (5th Cir. 2009) (citation omitted).

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court recently revisited Rule 8(a) and the allegations required to survive a Rule 12(b)(6) motion to dismiss in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).   Although Defendant Securities America characterizes these decisions as establishing a more rigorous and fact-intensive test at the pleading stage (Sec. Am. Mem. 5), the Court did not disturb the directive that a complaint should not be found deficient even if it is apparent "'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The Supreme Court held that "detailed factual allegations" are not required, but the complaint must include "sufficient factual matter... to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (*quoting Twombly*, 550 U.S. at 570); *see also Erickson v. Pardus*, 551 U.S. 89, 93 (2007) ("[s]pecific facts are not necessary" to satisfy the requisites of Rule 8(a)(2)); *Lormand*, 565 F.3d at 232.   Although "[t]he plausibility standard is not akin to a 'probability requirement,'" *Iqbal*, 129 S. Ct. at 1949, the Court reaffirmed the strong deference given to a pleading, stating that a claim need only "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555-56 (citations and footnote omitted); *Lormand*, 565 F. 3d at 232.

On a Rule 12(b)(6) motion, a court must "accept all factual allegations in the complaint as true" and "draw all reasonable inferences in the plaintiff's favor." *Lormand*, 565 F 3d at 232; *see Iqbal*, 129 S. Ct. at 1950 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to

relief."). Accordingly, a claim has "facial plausibility" and is sufficiently pled for purposes of Rule 12(b)(6) when its "factual content … allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*, 129 S. Ct. at 1949 (*citing Twombly*, 550 U.S. at 556).

### B.   Plaintiffs' Claims Do Not Sound In Fraud and Are Not Subject to Rule 9(b)

#### 1.   Plaintiffs Do Not Allege that Defendants Acted Fraudulently

Defendants' argument[3] that the Complaint must satisfy the heightened pleading standard of Rule 9(b) fundamentally misconstrues Plaintiffs' allegations and improperly injects new elements into Plaintiffs' claims. (Sec. Am. Mem. 4-6; NEXT Mem. 13, 22.) Plaintiffs do not allege that Defendants acted fraudulently; in fact, Plaintiffs specifically disclaim any allegation that Defendants acted with fraudulent intent or scienter. (¶ 9.) Defendants' unlawful conduct, Plaintiffs allege, was selling Provident Securities by means of PPMs that contained false and misleading statements—an offense for which Texas law imposes liability without regard to the seller's state of mind—and negligently failing to conduct due diligence in violation of their fiduciary duty to Plaintiffs and the Class.

Under Fifth Circuit law, when a complaint "'do[es] not assert that defendants are liable for fraudulent or intentional conduct and disavow[s] and disclaim[s] any allegation of fraud'…Those claims do not 'sound in fraud' and cannot be dismissed for failure to satisfy Rule

---

[3]   Defendants NEXT, NEXT Holdings, GunnAllen and GunnAllen Holdings adopted, in their joint motion to dismiss, all arguments made by their co-Defendants. (NEXT Mem. 1 n.2). Defendants National Securities, National Holdings, Capital Financial, Capital Holdings, CapWest, Capstone, QA3 and QA3 LLC adopted all arguments made by NEXT, NEXT Holdings and Securities America (Natl Sec. Mem. 1-2; CapFin Mem. 1; CapWest Mem. 1; QA3 Mem. 1.).

9(b)."  *Lone Star Ladies Inv. Club v. Shlotzsky's Inc.*, 238 F. 3d 363, 369 (5th Cir. 2001).[4]

Although Defendants argue that the "gravamen" of Plaintiffs' claims involves fraud (Sec. Am.

7), there are no such allegations in the Complaint.  Securities America's citation to a handful of

supposed allegations of fraud takes phrases out of context.  (*Id.*)  Those citations actually refer

to:  Plaintiffs' summary of the SEC complaint against Provident Royalties and its principals (*id.*,

citing ¶ 7); Plaintiffs' summary of the Receiver's report regarding PAM (*id.*, citing ¶ 8); and

Plaintiffs' reiteration of the elements of the claim – taken verbatim from the TSA – in connection

with setting forth Defendants' misrepresentations *Id.*, citing ¶ 79).

Defendants have cited no cases in which a court imposed a Rule 9(b) pleading standard

where, like here, the only claims alleged are non-fraud based claims.  Because Plaintiffs allege

no fraud claims, the Court need not determine whether the "non-fraud claims are 'so intertwined'

with the fraud averments" that imposition of the Rule 9(b) standard is warranted.  *See Kennard v.*

*Indianapolis Life Ins. Co.*, 420 F. Supp. 2d 601, 609 (N.D. Tex. 2006).  Nor is this a case like

*Melder v. Morris*, where the plaintiffs pled both fraud claims under the Exchange Act and non-

fraud claims under the Securities Act, and their non-fraud claims incorporated the allegations of

their fraud-based claims.  27 F. 3d 1097, 1100 n.6 (5th Cir. 1994) (citing "the complaint's

wholesale adoption of the allegations under the securities fraud claims for purposes of the

Securities Act claims"); *see also See Wagner v. First Horizon Pharm. Corp.*, 464 F. 3d 1273,

1278 (11th Cir. 2006) ("[A] § 11 or § 12(a)(2) claim must be pled with particularity when the

---

[4]  By contrast, in some of Defendants' cases, courts applied the Rule 9(b) standard simply because the plaintiff did not argue that Rule 8 governed their non-fraud based claims.  *See, e.g.*, *Williams v. WMX Tech., Inc.*, 112 F. 3d 175, 177 (5th Cir. 1997) (applying Rule 9(b) applied because "the parties ha[d] not urged a separate focus" on non-fraud claims); *see also Am. Realty Trust, Inc. v. Travelers Cas. & Surety Co.* 362 F. Supp. 2d 744, 749 (N.D. Tex. 2005) (holding that Rule 9(b)'s heightened pleading standard may apply to negligent misrepresentation claims when "a plaintiff waives arguments to the contrary").

facts underlying the misrepresentation at stake in the claim are said to be part of a fraud claim, as alleged elsewhere in the complaint… This conclusion does not add new elements to the nonfraud claims, nor does it elevate the pleading standard when the claim is not alleged to have been part of another fraud-based claim.").

Defendants cannot use Rule 9(b) to inject new elements into Plaintiffs' claims or require Plaintiffs to plead more in support of those claims than they are required to prove at trial. *See, e.g., Am. Realty*, 362 F. Supp. 2d at 749 ("Rule 9(b) has no application to circumstances that do not constitute fraud or mistake"); *Kennard*, 420 F. Supp. 2d at 609 (citing *Am. Realty Trust, Inc. v. Hamilton Lane Advisors*, Inc., 115 Fed. Appx. 662, 668 (5th Cir. 2004) ("[T]he Fifth Circuit has declared that "'Rule 9(b)'s stringent pleading requirements should not be extended to causes of action not enumerated therein.'")).

### 2. Rule 9(b) Does Not Apply to Plaintiffs' TSA Article 581-33 Claims

Defendants' own cases acknowledge that "there are no heightened pleading requirements" for claims under TSA Article 581-33. *See In re Enron Corp. Sec., Derivative & ERISA Litig.,* 235 F. Supp. 2d 549, 708 (S.D. Tex. 2002) (holding that the TSA does not require proof of reliance, scienter, or seller's duty to disclose*); Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 343-344 (5th Cir. 2008) ("unlike a common law fraud cause of action, an article 581-33 claim does not require scienter…"). Claims under TSA 581-33F(1) against control persons (which are construed in accordance with parallel federal securities laws) are also governed by Rule 8. *See Trendsetter Inv., LLC, v. Hyperdynamics Corp, et al.*, No. H-06-0746, 2007 WL 172627, at *15 (S.D. Tex. Jan. 18, 2007) (allegations under Section 20(a) of Exchange Act and the TSA must "be pleaded only in accordance with Rule 8(a) … because fraud is not an essential element" of control person claims); *Brody v. Zix Corp.*, No. 3:04-CV1931-K, 2006 WL 2739352,

at *9 (N.D. Tex. Sept. 26, 2006) (Rule 8, rather than Rule 9, applies to control person liability claims under the federal securities laws).

Defendants cite cases in which courts refer to the TSA an "anti-fraud statute," but this label alone does not inject new elements into the claim, and those cases do not even address the applicable pleading standard. *See Anderson v. Vinson Exploration, Inc.*, 832 S.W.2d 657, 661-662 (Tex. App. 1992) (analyzing directed verdict, not pleading standard, and identifying the elements of a TSA Article 581-33A(2) claim as "an offer or sale of a security by means of either an untrue statement of a material fact or an omission of a material fact which is necessary in order to make the statement made, in light of all of the circumstances, not misleading"); *Grotjohn Precise Connexiones Int'l, S.A. v. JEM Fin., Inc.*, 12 S.W.3d 859, 867 (Tex. App. 2000) (analyzing summary judgment, not pleading standard, but identifying same elements of a TSA Article 581-33A(2) claim). And Defendants' citations to non-TSA cases where, unlike here, the plaintiffs alleged that the defendants engaged in fraudulent conduct, are inapposite. *See In re Ikon Office Solutions, Inc. Sec. Litig.*, 86 F. Supp. 2d 481, 488 (E.D. PA. 2000) ("plaintiffs seemingly allege that all of the ERISA defendants participated in fraudulent practices"); *Herrington v. Household, Int'l, Inc.*, No. 02 C 8257, 2004 WL 719355, at *7 (N.D. Ill. Mar. 31, 2004) ("the allegations in the complaint clearly allege [Defendants'] intentional misrepresentations").

Plaintiffs do not allege any fraud-based claims against Defendants, and the fact that Plaintiffs allege that the Provident Entities engaged in a Ponzi scheme does not transform Plaintiffs' claims into "fraud-based" claims. *See Enron*, 235 F. Supp. 2d at 613, 708 (applying Rule 8 in denying motions to dismiss TSA claims against brokers in a case alleging "an enormous Ponzi scheme").

11

### 3.   Rule 9(b) Does Not Apply to Plaintiffs' Breach of Fiduciary Duty Claim

Rule 9(b) does not apply to breach of fiduciary duty claims that are not based on allegations of fraudulent conduct. *See, e.g., City of Driscoll v. Saenz*, No. C-06-543, 2007 WL 173232, at *5 (S.D. Tex. Jan. 17, 2007) ("A claim for breach of fiduciary duty is covered by the notice pleading standard in Fed. R. Civ. P. 8(a), not the heightened pleading standard for fraud claims set forth in Fed. R. Civ. P. 9(b)."); *see also Brown v. Whitcraft,* No. 3:08-CV-0186-D, 2008 WL 2066929, at *4 (N.D. Tex. May 15, 2008), citing *Peters v. Metro. Life Ins. Co.*, 164 F. Supp. 2d 830, 836 (S.D. Miss. 2001) ("Rule 9(b) also applies to a claim for breach of fiduciary duty when the claimed breach rests upon the same allegations as a fraud claim.")).

The Fifth Circuit cases Defendants cite do not involve fiduciary duty claims at all. *See Lone Star Ladies Inv. Club*, 238 F.3d at 363; *Melder*, 27 F.3d At 1097. The only two cases Defendants cite that do address the application of Rule 9(b) to breach of fiduciary duty claims are district court cases from Illinois and Michigan in which the plaintiffs alleged breach of fiduciary duty under ERISA, and even those cases recognize that the claim is subject to Rule 9(b) only if it is based on allegations of fraud. *See Rogers v. Baxter Int'l, Inc.*, 417 F. Supp. 2d 974, 984 (N.D. Ill. 2006) ("While claims for breach of fiduciary duty under ERISA generally are not subject to heightened pleading standards, Rule 9(b) does apply where the plaintiff alleges that a defendant's breach of fiduciary duty took the form of a fraudulent act."); *In re General Motors ERISA Litig.*, No. 05-71085, 2006 WL 897444, at *16 (E.D. Mich. Apr. 6, 2006) (in ERISA case, where a plaintiff's fiduciary duty claim is premised on an allegation "that a defendant has lied," Rule 9(b) may apply).

12

## II.   PLAINTIFFS HAVE SUFFICIENTLY PLED A CLAIM UNDER TSA ARTICLE 581-33

### A.   Plaintiffs' Allegations Satisfy Rule 8 and, Although Not Required, Also Satisfy Rule 9(b)

To state a claim under TSA Article 581-33A(2), Plaintiffs must allege "an offer or sale of a security by means of either an untrue statement of a material fact or an omission of a material fact which is necessary in order to make the statement made, in light of all of the circumstances, not misleading." *Anderson*, 832 S.W.2d at 661-662.  The plain language of the statute confirms that reliance, scienter and the seller's duty to disclose are not elements of a claim for violation of the statute:

> A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, **is liable** to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security.

TSA Article 581-33A(2)(emphasis added); *see also Enron*, 235 F. Supp. 2d at 708.[5]

Thus, as judged by the prerequisites of Rule 8(a), Plaintiffs have alleged sufficient facts to state a claim under TSA Article 581-33 that is plausible on its face, as required by *Twombly* and *Iqbal*.  Plaintiffs allege:

- The Broker Defendants offered and sold Provident Securities to Plaintiffs (¶¶ 2, 9, 106);

---

[5]   The TSA applies when "any act in the selling process of securities covered by the Act occurs in Texas," regardless of Plaintiffs' states of residence or the location of the sales. *Enron*, 235 F. Supp. 2d at 691 (citation omitted).  Because Provident Royalties, its founders and several of its related entities are all located in Texas, significant acts "in the selling process" occurred in Texas. (¶¶ 43-48, 51-52, 59.) Defendants' argument to the contrary is wrong. (Sec. Am. Mem. 6 n.3).

- The Broker Defendants' sale of Provident Securities to Plaintiffs was made by means of untrue statements of material facts and omissions to state material facts, including misrepresentations regarding the use of investors' funds (¶¶ 74-85);

- Plaintiffs purchased their Provident Securities from the Broker Defendants (¶¶ 16-26); and

- Plaintiffs seek rescission and have tendered their Provident Securities (¶ 139).

Moreover, Plaintiffs' factual allegations also satisfy the heightened pleading standard of Rule 9(b), which requires Plaintiffs to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Herrmann Holdings Ltd. v. Lucent Tech., Inc.*, 302 F.3d 552, 564-65 (5th Cir. 2002) (citations omitted).  The Complaint does exactly that:

- It specifies the exact statements contended to be untrue or misleading:  *i.e.*, statements in the PPMs regarding the nature of the Rule 506 Entities' business activities (¶¶ 74, 80); the uses of proceeds from the Offerings (¶¶ 75, 77, 78); and the segregation of investor funds (¶ 76);[6]

- It identifies the "speaker":  the Rule 506 Entities and Provident Royalties, as beneficial owner of the entities (¶¶ 51, 53).  For purposes of Article 581-33A(2) liability against the Broker Defendants, the PPMs were the means by which the Broker Defendants sold the securities to Plaintiffs (¶¶ 2, 64);

- It states when and where the statements were made:  in the PPM issued for each Offering on the dates each Offering commenced (¶ 55); and

---

[6]   For brevity, Plaintiffs quoted only statements from the Shale 12 PPM in their Complaint. Defendants do not dispute that identical or virtually identical statements were contained in each PPM.  (¶¶ 69, 74.)

- It explains why the statements were materially untrue or misleading, including setting forth the relevant omissions of material facts from the PPMs (¶¶ 79, 81, 85).

Thus, under Fifth Circuit authority, Plaintiffs have pled the elements of their TSA Article 581-33A(2) claim with sufficient particularity to withstand analysis under the more stringent pleading standard of Rule 9(b).[7]

Neither the elements of the TSA Article 581-33A(2) claim, nor Rule 9(b), require Plaintiffs to allege the names of Defendants' individual representatives, when and where Plaintiffs received the PPMs, the time and place of purchase, the amount of the investment, or that Plaintiffs relied on any of the misstatements.  Moreover, because Plaintiffs have adequately alleged the misstatements (¶¶ 74-81, 85), as well as the circumstances underlying those misstatements (¶¶ 86-92), no further details need be pled.[8]

**B.  TSA Article 581-33 Holds All Sellers "In The Chain" Liable and Does Not Require that Defendants "Make" the False or Misleading Statements**

Both the explicit language and the purpose of the statute belie Defendants' contention that a defendant seller must "make" a false or misleading statement to be liable under TSA Article 581-33A(2).  The express language of the statute imposes liability on a seller who did not "make" the statements at issue, requiring only that the sale be made "by means of" an untrue

---

[7]  Plaintiffs' allegations do not improperly "lump" Defendants together, as Defendants contend. (Sec. Am. Mem. 4, 11.)  Rather, Plaintiffs allege that each Broker Defendant engaged in the same misconduct in connection with the sale of Provident Securities.  (*See, e.g.*, ¶¶ 9, 11, 64, 65, 106.)

[8]  Should the Court find that the Complaint includes averments of fraud, not sufficiently particular, the Court should disregard them as surplusage and assess the remaining allegations. The Fifth Circuit has held that "[t]he proper route is to disregard averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated."  *Lone Star,* 238 F.3d at 368; *see also Am. Realty,* 362 F. Supp. 2d at 751 (inadequate fraud allegations are "mere surplusage" to a claim for which fraud is not an element, so the Court should disregard those aspects of averments of fraud that go beyond what is necessary to state a claim).

statement of material fact or an omission to state a material fact. TSA 581-33A(2). "[L]iability may be imposed against a defendant as long as the defendant constituted any link in the chain of the selling process." *Enron*, 235 F. Supp. 2d at 566. The Broker Defendants were indisputably a "link in the chain" of the sale of the Provident Securities who sold the securities "by means of" the PPMs containing false and misleading statements.[9]

Despite Defendants' attempt to sidestep the statute's terms, the clear "by means of" language is broader than "make." The First Circuit recently analyzed the meaning of the term "make" in Rule 10b-5 of the Securities Exchange Act in *Securities and Exchange Comm'n v. Tambone*, No. 07-1384, 2010 WL 796996, at *7 (1st Cir. Mar. 10, 2010). There, the Court contrasted the language of Rule 10b-5 with the language of Section 17(a) of the Securities Act, which makes it unlawful "to obtain money or property *by means of* any untrue statement of material fact." *Id.* (quoting 15 U.S.C. § 77q(a)(2)) (emphasis added). Recognizing the "salient difference" between "'by means of'" in § 17(a) of the Securities Act and "make" in Rule 10b-5, the Court concluded that "although section 17(a) may fairly be read to cover the 'use' of an untrue statement to obtain money or property, Rule 10b-5(b) is more narrowly crafted and its reach does not extend that far." *Id.* (internal citation omitted). Thus, the substantial difference between the statutes' language precludes any analysis of TSA § 33A(2) through the spectrum of Rule 10b-5.[10]

---

[9] The contention that Plaintiffs' allegation regarding the Broker Defendants' role in the process of selling Provident Securities in ¶ 64 is "contradict[ed]" by other allegations regarding drafting of the PPMs (NEXT Mem. 14) disregards the explicit language of ¶ 64: "[The Broker Defendants] participated in the drafting, preparation, approval, due diligence and/or dissemination of various materially false and misleading statements …"

[10] Defendants' cases citing Rule 10b-5 are therefore irrelevant to understanding the TSA's "by means of" language. (*See* Sec. Am. Mem. 13, citing *In re Charter Commc'ns, Inc.*, 443 F. 3d 987, 992 (8th Cir. 2006); *Wright v. Ernst & Young LLP*, 152 F. 3d 169, 175 (2d Cir. 1998);

Texas courts have recognized that the TSA's language is broader than that used in its federal counterpart, Section 12(a)(2) of the Securities Act. *See Duperier v. Texas State Bank*, 28 S.W.3d 740, 753 (Tex. App. 2000) (Section 12(2) of the Securities Act is "the federal version of article 581-33A(2)"); *Texas Capital Sec. Inc. v. Sandefer*, 58 S.W.3d 760, 775 (Tex. App. 2001) stating that the TSA "differs from its federal counterpart in that it does not contain the phrase of limitation 'by means of a prospectus or oral communication'" and "[h]ad the Texas Legislature intended to limit the scope of article 581-33(A)(2), it could have used limiting language, as did Congress."). Section 12(a)(2) similarly does not require that the seller "make" the statement in order to be subject to liability. *See Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 538-39 (9th Cir. 1989) (plaintiffs stated claim under 12(a)(2) of Securities Act against stockbrokers that distributed sales promotion data containing misstatements).

Defendants ignore the "by means of" language in the statute and instead cite cases that stand for the unremarkable proposition that a seller who drafted or uttered false or misleading statements may be held liable under the TSA. These decisions do not alter or restrict the meaning of the "by means of" language in the statute. *See Duperier*, 28 S.W.3d at 745 (addressing liability of a bond salesman who personally made statements to investing bank about the securities); *Crescendo Inv., Inc. v. Brice*, 61 S.W.3d 465, 475 (Tex. App. 2001) (addressing liability of corporation issuing securities for statements made by its officers); *Aegis Ins. Holding Co. v. Gaiser*, No. 04-05-00938, 2007 WL 906328, at *6 (Tex. App. Mar. 28, 2007) (an LLC that drafted a PPM is liable under the TSA); *Covenant Capital Partners v. Soil Savers, Inc.*, No.

---

*Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996); NEXT Mem. 13, citing *Enron*, 235 F. Supp. 2d at 588.) Similarly, a decision on a common law fraud claim provides no assistance here. (NEXT Mem. 14 n. 4, citing *The Jordan (Bermuda) Inv. Co. v. Hunter Green Inv. LLC*, No. 00-9214, 2007 WL 2948115 at *14 (S.D.N.Y. Oct. 3, 2007).)

3:06-CV-0399-O, 2008 WL 2941125, at *3 (N.D. Tex. July 30, 2008) (defendants that "prepared a promotional booklet that was distributed to prospective investors to induce them to purchase stock" found liable under TSA). Finally, in *R2 Inv. v. Phillips*, the court dismissed the plaintiff's TSA claim because the defendant was "not a seller, control person or aider as defined by the Act" and was not alleged to have made any untrue statements or omitted any material facts. No. 302CV323N, 2003 WL 22862738, at *1, *7 (N.D. Tex. Mar. 26, 2003).

Holding liable all sellers "in the chain" who use false or misleading statements to sell the securities, regardless of whether they were the ones who actually drafted the statements, furthers the purpose of the TSA, which "is to be construed 'to protect investors.'" *Enron*, 235 F. Supp. 2d at 566 (quoting *Sandefer*, 58 S.W.3d at 775). "The purpose of The Securities Act is to require sellers of securities to be truthful and to provide investors with all material facts and, thus, allow them to make informed decisions." *Gant v. State*, 814 S.W.2d 444, 449 (Tex. App. 1991). And "'because article 581-33 is remedial in nature in the civil context, it 'should be given the widest possible scope.'" *Enron*, 235 F. Supp. 2d at 566 (quoting *Sandefer*, 58 S.W.3d at 775).[11]

## III.    THE MATERIAL MISSTATEMENTS AND OMISSIONS IN THE PPMS ARE ACTIONABLE

Defendants argue that the material misstatements alleged in ¶¶ 74-81 are either forward-looking in nature and "bespeak caution," or "promises" of future performance that are not actionable under the Texas Securities Act. (Natl Sec. Mem. 4; NEXT Mem. 15-18; Sec. Am. Mem. 14, CapFin Mem. 3, CapWest Mem. 3; QA3 Mem. 3.) They are wrong.

---

[11]    Moreover, the TSA provides an affirmative defense to sellers if they prove that they "did not know, and in the exercise of reasonable care could not have known, of the untruth or omission." Article 581-33A(2). Defendants may avail themselves of this defense, if applicable, at the appropriate stage of the litigation.

### A.     The Bespeaks Caution Doctrine Does Not Apply to Plaintiffs' Claims

Texas has specifically rejected the adoption of the "bespeaks caution" doctrine.  Texas

precedent holds that, in connection with a claim under the TSA, the bespeaks caution doctrine is

"not recognized by the statutory or case law" of Texas.  *Duperier*, 28 S.W.3d at 752 (cited in

Sec. Am. Mem. 12[12]).   It is not surprising then that Defendants have not cited any cases

specifically applying the bespeaks caution doctrine to a TSA claim.[13]  Rather, under Texas law,

the relevant analysis is whether Plaintiffs have sufficiently alleged the materiality of the

misstatements at issue in light of the surrounding circumstances.  *Id.*   Thus Defendants'

arguments that apply the bespeaks caution doctrine should be rejected.

Even in the Fifth Circuit's view, the bespeaks caution doctrine "merely reflects the

unremarkable proposition that statements must be analyzed in context."  *Rubinstein v. Collins*, 20

F.3d 160, 167 (5th Cir. 1994).[14]   Thus, the Court must determine whether the cautionary

language provided in the PPMs renders the alleged misstatements and omissions immaterial:

> "[M]ateriality is not judged in the abstract, but in light of the surrounding
> circumstances."  The appropriate inquiry is whether, under all the circumstances,
> the omitted fact or the prediction without a reasonable basis "is one [that] a

---

[12]     Defendant Securities America cites to *Duperier* but it does not argue that the bespeaks
caution doctrine applies to Plaintiffs' claims, as the other Defendants do.

[13]     Defendants suggest that *Millcreek Associates, L.P. v. Bear, Stearns & co.*, 205 F. Supp. 2d
664 (W.D. Tex 2002) applies the bespeaks caution doctrine to TSA claims.  (NEXT Mem. 17.)
The court applied the doctrine to the plaintiff's 10b-5 claim but, with respect to the plaintiff's
TSA 581-33 claim, the court found, at most, that there was no privity between the parties and/or
that the misrepresentations plaintiffs alleged were not material. *Id.* at 676.

[14]     Defendant NEXT cites *Zuckerman v. Foxmeyer Health Corp.*, 4 F. Supp. 2d 618, 624 (N.D.
Tex 1998) which quotes this language from *Rubinstein*.  Applying this contextual analysis, the
*Zuckerman* court denied the motion to dismiss:  "The court has examined Defendants' alleged
statements in light of the appellate court's holding in *Rubinstein* and concludes that, when read in
the context of all the allegations in the complaint, Plaintiffs have properly alleged that
Defendants' statements were baseless or untruths and may, therefore, be actionable as unfounded
prediction under Section 10(b)."  *Id.* at 625.

reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment." Inclusion of cautionary language-along with disclosure of any firm-specific adverse facts or assumptions-is, of course, relevant to the materiality inquiry, for such inclusion or disclosure is part of the "total mix of information." *Nevertheless, cautionary language as such is not per se dispositive of this inquiry.*

*Id.* at 167-68 (emphasis added) (footnotes omitted); *see also Kurtzman v. Compaq Computer Corp.*, No. Civ. A.H-99-779, 2000 WL 34292632, at *6 n. 13, 16 (S.D. Tex. Dec. 12, 2000).

Defendants assert the "*per se*" defense that the Fifth Circuit has explicitly rejected. *Enron*, 235 F. Supp. 2d at 576, citing *Rubinstein*, 20 F.3d at 162. (*See* NEXT Mem. 17.) They never challenge or discuss the materiality of the alleged misstatements, which is not surprising given that an analysis of materiality here would require resolution of factual issues that cannot be resolved on a motion to dismiss. As the *Kurtzman* court held:

> The disclosures identified by Defendants contain broad cautionary warnings about factors such as competition, industry risks, etc.....This Court, in a 12(b)(6) motion, cannot conclude that the adverse facts alleged here by Plaintiffs would not have led a reasonable investor to believe that the mix of information had been significantly altered. There are issues as to the specificity and materiality of the general warnings pointed out by Plaintiffs...that preclude dismissal under 12(b)(6). Materiality is a mixed question of fact and law, and a complaint may not be dismissed under Rule 12(b)(6) unless the alleged misstatements and omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."

2000 WL 34292632, at *39 (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)) (other citations omitted). Defendants have not met, and cannot meet, this test for materiality *as a matter of law* in the context of Plaintiffs' allegations.

As detailed more fully below, Plaintiffs have specifically set forth the statements alleged to be materially misleading (¶¶ 74-78, 80) and have set forth specific reasons to substantiate why those statements are alleged to be materially misleading. (¶¶ 79, 81). Accepting those allegations as true and drawing all inferences in Plaintiffs' favor, as it must on this motion, this Court should

reject Defendants' attempt to by-pass the required materiality analysis, particularly where, as here, Defendants have not, and cannot, show that the alleged misstatements are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Kurtzman*, 2000 WL 34292632, at * 39.   In other words, viewing the statements in the PPMs as a whole, it is plausible that a reasonable investor would have considered the "total mix" of information about Provident Securities in a different light had the Provident Entities disclosed the information Plaintiffs allege was misstated and omitted.  (¶¶ 79, 81).  *See Krim v. BancTexas Group*, 989 F.2d 1435, 1448 (5th Cir. 1993).  Thus, Defendants' motions to dismiss should be denied.

**B.      The Alleged Material Misstatements and Omissions in the PPMs Are Neither Forward-Looking Statements Nor Statements of Future Performance**

Because Texas state law does not adopt the bespeaks caution doctrine, Texas state courts have not defined the types of statements that qualify as forward-looking statements.  Defendants rely on their analogy to the PSLRA's safe harbor for forward-looking statements and related federal law.[15]   (NEXT Mem. 15-16.)   However, the PSLRA specifically states that the safe harbor does not apply to statements made in connection with an initial public offering.  15 U.S.C. § 77z-2(b)(2)(D).  *See In re: Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005).  As each of the Rule 506 Entities at issue in this action had "no prior operating history" (*see* NEXT Ex. A. at 11 (describing "the Corporation")), they were akin to initial public offerings.

Nevertheless, even under the PSLRA, a forward-looking statement is limited to:

> A.    a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

---

[15]   Texas courts look to federal securities laws decisions to assist them in interpreting the TSA. *Herrmann Holdings*, 302 F.3d at 563.

B.   a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

C.   a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

D.   any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

E.   any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

F.   a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 77z-2(i)(1).   None of the statements at issue fall into the above categories, nor are they "promises" of future performance, as Defendants allege.   (Sec. Am. Mem. 13-14.)   Thus, they do not provide a shield to Defendants.   *Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 744 (S.D. Tex. 2003) (the bespeaks caution doctrine only applies to predictive statements and omissions); *Kurtzman*, 2000 WL 34292632, at *25 (the safe harbor "applies only where the statements are forward-looking (not historical or current facts)").

In paragraph 74 of the Complaint, Plaintiffs quote a statement from a prototypical PPM (*see, e.g.,* NEXT Ex. A) that is found under the heading "Business Plan."   It states facts: *i.e.*, the purported purpose of the Rule 506 Entities, the means by which the entity supposedly intends to conduct business and the powers the entity possessed to accomplish that purpose:

74. …The Corporation was organized to engage in all aspects of the oil and gas business, including acquiring real estate, oil and gas leases and mineral interests, and conducting exploration and development activities.   The Corporation intends to acquire a combination of various producing and non-producing mineral interests [including royalty interests and working interests] in real property located within the United States.   The Corporation may acquire oil and gas leases and subsequently farm-out or sublease such leases.   The Corporation may acquire real estate, including surface rights, and subsequently hold or sever and sell the

surface rights.  The Corporation may acquire real estate, mineral interests and leases from affiliates of the Corporation or may sell real estate, mineral interests or leases to affiliates.  The Corporation anticipates that its properties will be developed by oil and gas exploration and development companies, which may include affiliates of the Corporation.  The Corporation may participate in oil and gas drilling programs, directly as a working interest owner or indirectly through investment in others.  The Corporation may issue and sell additional securities, sell assets, or incur debt, to finance its activities or to participate on or redeem the Preferred Stock…

Such statements are not forward-looking, nor a promise of future performance.  *See Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1405-1406 (7th Cir. 1995) (statement regarding "plans" that exist or are being formulated is a present assertion of fact and bespeaks caution doctrine does not apply); *see also Lindelow v. Hill*, No. 00 C 3727, 2001 WL 830956, at *4 (N.D. Ill. July 20, 2001) ("statements of goal can, in context, be read by the investor to imply that the company had a reasonable basis for its opinion" and are not automatically protected).

Likewise, as in *Harden*, the PPM statements and allegations in ¶¶ 75-78 are present assertions of facts:  they explain the essential terms of the investment, including the intended uses of investor proceeds, their segregation into separate accounts, and the percentage of proceeds to be dedicated to oil and gas investments:

75.  [Use of Proceeds]…Proceeds of the offering are intended to be used primarily to acquire Properties, and may be used to pay intangible Property Acquisition Costs, which may include an allocated portion of costs incurred by affiliates.  The Corporation will use the proceeds of the offering to pay organization and offering costs, to pay non-accountable due diligence and syndication fees and sales commissions to securities broker/dealers, including an affiliate of the Corporation, and to implement its plan of business…

76.  [Terms of the Offering] Each of the PPMs represented that investor funds would be placed in a separate account belonging to the Rule 506 Entity at issue.

77.  [Use of Proceeds of Offering] Each PPM included a chart setting forth the use of proceeds from that Offering, indicating the percentage of Plaintiffs and Class members' funds that would be dedicated to oil and gas investments.  For example, in Shale 12, the following description appeared in the Use of Proceeds section, indicating that eighty-six percent of investor proceeds were designated for oil and

23

gas investments:

Assuming that the Corporation raises a total of $35,000,000 from the sale of Preferred Stock:

|  | MAXIMUM |  |
|---|---|---|
| Subscription Proceeds | $35,000,000 | 100.00% |
| Organizational Expenses | $175,000 | 0.50% |
| Syndication Fee | $1,575,000 | 4.50% |
| Sales Commission/Due Diligence Fee | $3,150,000 | 9.00% |
| Oil and Gas Investments | $30,100,000 | 86.00% |
| Total Gross Proceeds | $35,000,000.00 | 100.00% |

78.   Under "Oil and Gas Investments," the PPM stated: The proceeds of the offering, after payment of expenses, fees and commissions, will be used to implement the Corporation's plan of business.  Proceeds will be used primarily to acquire Properties and may be used to pay overhead and administrative expenses and Property Acquisition Costs.

These representations are not forward-looking statements, nor promises of future performance.

They are Defendants' statements about plans that existed at the time the statements were made.

Moreover, any suggestion that ¶¶ 75-78 are forward-looking statements by way of "prediction"

is overcome by the fact that those representations are so intertwined with the representations of

present facts that all of the statements amount to representations of fact.   *See Trenholm v.*

*Ratcliff*, 646 S.W.2d 927, 930-931 (Tex. 1983).

Because Plaintiffs have shown above why ¶¶ 74-78 of the Complaint are not forward-

looking statements, ¶ 79[16] cannot be a forward-looking statement; its purpose is to explain why the statements made in ¶¶ 74-78 are untrue statements of materials facts and omissions related to the representation of present facts:[17]

79.   The PPMs contained untrue statements of material facts and omitted to state material facts necessary to make the statements made in ¶¶ 74-78, in light of the circumstances under which they were made, not misleading because:

a.      Provident was not using the proceeds from the Offerings to invest in the oil and gas business at the amounts reported to investors (*i.e.* purportedly over $560 million was spent by the Provident Entities in receivership to purchase oil and gas assets but the value of these assets are estimated by the Receiver to be less than $30 million);

b.      Less than half of investors' funds were used for the purposes stated in the PPMs;

c.      Investors' funds received in connection with one Offering were commingled with the funds received from investors in other Offerings;

d.      Funds received from later investors were used to pay dividends and returns of capital to earlier investors;

e.      The lack of audited financial statements facilitated the Provident Entities' ability to engage in financial misconduct;

f.      The Provident Entities' internal financial statements lacked transparency as to the financial performance and soundness of prior Offerings;

g.      The Provident Entities lacked adequate internal controls over its financial and accounting functions;

h.      The Provident Entities engaged in numerous undocumented and undisclosed inter-company transactions where funds from one Rule 506 Entity were loaned to another Rule 506 Entity for purchase of leases or payment of dividends;

---

[16] Securities America does not characterize ¶79 as a "promise" or statement of "future performance." (*See* Sec. Am. Mem. 14.)

[17] Despite Defendants' contentions (NEXT Mem. 18), Plaintiffs do not allege any misstatements regarding the stability of the oil and gas market or the liquidity of the investment.

i.      The Provident Entities were paying millions of dollars of investors' funds to a firm owned by Blimline for properties, without receiving adequate documentation of title to and values of the properties;  and

j.      The Offerings were conducted to effectuate a Ponzi scheme operated by the Provident Group.

Paragraph 80 quotes statements from two separate PPMs to show that the Rule 506 Entities were materially misstating their sources of revenue:

80.  The anticipated sources of the Rule 506 Entities' revenue set forth in the PPMs changed over time.  The Shale 5 PPM stated:  "The Corporation anticipates that it will receive revenue from the payments under oil and gas leases for the Properties it acquires…[with] five primary areas that will be potential sources of revenue for the Corporation [bonuses, royalty interest, delay rentals, carried working interest and shut-in royalties]."  In contrast, the PPM for Shale 12 stated: "The Corporation anticipates that its *primary* source of revenue will be from the sale of assets.  The Corporation anticipates that it *also* will receive revenue from the payments under oil and gas leases for the Properties it acquires."  (emphasis added).  Both of these statements were materially false and misleading and omitted material facts, as set forth in ¶ 79, above.

The quoted statements are not forward-looking because they are explanations of the Rule 506 Entities' then-existing plan for obtaining revenue.  *See, e.g., Harden*, 65 F.3d at 1405-1406.  For that same reason, they are not promises of future performance.

Paragraph 81 alleges that the PPMs omitted material information regarding the sources of funds used to pay investor distributions and dividends:

81.      Moreover, the Broker Defendants and the Provident Group failed to disclose the sources of funds used to pay distributions and dividends to investors. The PPMs did not disclose whether any revenues generated by the Rule 506 Entities were used to pay investors, or whether loan proceeds, income generated from properties, sales of assets, funds from investors in other Rule 506 Entities or commingled funds were used to make distributions.

The omission of these material facts regarding the nature of the investment and how the Rule 506 Entities were paying distributions and dividends at the time the statements were made is not forward-looking.

Defendants' arguments turn on cherry-picking words out of context, but the use of words and phrases like "will be," "would be," "anticipate," "intend to" and "may" do not transform statements of present and past circumstances into forward-looking statements. As discussed above, statements must be analyzed in context. *See, e.g., Rubinstein*, 20 F.3d at 167-68. When such an analysis is done here, the facts support the conclusion that the statements are material. At the very least, a contextual analysis supports the conclusion that the statements simply cannot be adjudged immaterial as a matter of law.

The fact that the PPMs themselves characterize a litany of statements as "forward-looking" does not insulate Defendants from liability. (NEXT Mem. 16 and NEXT Ex. A at 2.) Not only is the list of "categories" of forward-looking statements broad and all-encompassing, going so far as to include statements regarding business strategy and the nature of the investment, the PPMs also claim that "any statements we make other than historical fact" are forward-looking statements. This is an impermissible (and ineffective) attempt to shroud every representation in the PPMs under the cloak of "forward-looking statement." The Fifth Circuit holds that such blanket classifications afford no protection: Defendants may not "evade liability for a material misrepresentation or omission by liberally sprinkling the document with boilerplate warnings and disclaimers of responsibility." *Krim*, 989 F. 2d at 1448-49.

**C.     The PPMs Did Not Include the Required Meaningful Cautionary Language**

None of the statements that Plaintiffs alleged to be false and misleading can be characterized as forward-looking statements. But even assuming they could, and assuming the bespeaks caution doctrine applies to a TSA claim, none of the statements were accompanied by the required meaningful cautionary language. The bespeaks caution doctrine is only applicable to "optimistic projections that are accompanied by relevant cautionary statements and specific

27

risk disclosure that render the alleged misleading statement immaterial since it would not affect a reasonable investor's investment decisions." *Kurtzman*, 2000 WL 34292632, at *38. "Under Fifth Circuit precedent, '[C]autionary language is not necessarily sufficient in and of itself, to render predictive statements immaterial as a matter of law.'" *Id.*, at * 6 (quoting *Rubinstein*, 20 F.3d at 167-68) (citing *Krim*, 989 F.2d at 1448-49).

Defendants cannot rely upon boilerplate warnings of the "high degree of risk" in the investment and the "Risk Factors" included in the PPMs as a shield from liability. (NEXT Mem. 16-18 and NEXT Ex. A at 11.) The Risk Factors deal broadly with: "Risks Associated with Acquiring Oil and Gas Interests"; "Risks of Stock Ownership"; and "Tax Risks." (NEXT Ex. A at 11.) The inclusion of this type of so-called cautionary language in the PPMs does not provide the protection Defendants seek. More is required than mere generic, broad disclaimers:

> A few Defendants have maintained that they are not liable for alleged misstatements in analysts' reports because the investors could not have reasonably relied on them, not only in light of their use of qualified language (*e.g.*, "we believe," "we forecast," "we expect," "we feel very comfortable"), but also because of express disclaimers, such as "does not warrant its completeness or accuracy," "past performance is not indicative of future results," or "the recipient of this report must make its own independent decisions regarding any securities or financial instruments mentioned herein." The Court disagrees. Generally a disclaimer is enforceable only where it "tracks the substance of the alleged misrepresentation." *Grumman Allied Indus. v. Rohr Indus., Inc.*, 748 F.2d 729, 735 (2d Cir. 1984). *See also Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir. 1993)(to be effective a disclaimer "must contain explicit disclaimers of the particular representations that form the basis" of the fraud claim). Under both the statutory safe harbor and the bespeaks caution doctrine, as discussed, the warnings may not be vague, generic, cursory disclaimers, but instead must be "meaningful cautionary statements" identifying important factors that might cause material differences in actual results, or must be adequate and specific.

*Enron*, 235 F. Supp. 2d at 689-690; *accord Kurtzman*, 2000 WL 34292632, at *38-39 ("[T]he cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions ... which the plaintiffs challenge."). The general Risk Factors in the PPMs

cannot be interpreted to somehow encompass the alleged misrepresentations and omissions at issue here, which specifically relate to the present business plans and the use of investors' funds.[18]  Thus, it remains that "[f]rom the context of the alleged misrepresentations and drawing all inferences in favor of the plaintiff, these warnings, while somewhat specific, do not provide sufficiently meaningful caution about clearly present danger that was materializing."  *Lormand*, 565 F. 3d at 247.  Accordingly, the so-called cautionary language included in the PPMs does not render the alleged misstatements and omissions immaterial as a matter of law.

### D.   Plaintiffs Have Satisfied Any Requirement that They Allege Fraudulent Intent by the Speaker

Defendants attempt to transform the representations of present fact set forth in ¶¶ 74-78 and 80 into "promises of future performance." (*See* Sec. Am. Mem. 14.)  Their reason for doing so is obvious.  It is the only way they can try to inject a "scienter" element into the TSA claim, which otherwise does not require any allegations of the speaker's intent.  *See, e.g., Herrmann Holdings*, 302 F. 3d at 563; *Dorsey*, 540 F.3d at 344 n.5.  Because the challenged misstatements and omissions relate to past and present facts about the Rule 506 Entities and their business activities, there is no merit to Defendants' argument that Plaintiffs must allege fraudulent intent.

Indeed, the statements here that Plaintiffs identify as false or misleading are completely different from those addressed in *Herrmann Holdings*, 302 F. 3d at 562.  In *Herrmann Holdings*, the court was confronted with a breach of contract as well as a TSA claim regarding "best efforts" provisions in a contract that required defendants to file and cause a Form S-3 registration

---

[18]    Unlike *Millcreek*, 205 F. Supp. 2d at 682 and *Tarica v. McDermott Int'l.*, No. Civ. A. 99-3831, 2000 WL 134 6895 (E.D. La Sept. 19, 2000), none of the cautionary language here was "coupled with the statements at issue" as Defendants assert (NEXT Mem. 17).  Rather, the "cautionary language" contains no "explicit disclaimers of the particular representations that form the basis" of the alleged misrepresentations actions underlying Plaintiffs' claims.  *See Enron*, 235 F. Supp. 2d at 689-90.

statement to become effective "as promptly as practicable" and "in the most expeditious manner practicable." *Id.*, 302 F.3d at 556.  Although the defendants had filed the Form S-3, the claims focused upon the timeliness of the filing.  *Id.* at 557.  Finding that the district court had correctly concluded that the *Herrmann Holding*'s TSA claim was based on an "untrue promise to do a future act, as opposed to an untrue statement of existing material fact (*id.* at 562-63), the court dismissed the claim due to the failure to allege fraudulent intent by the speaker of the statements. *Id.*  Here, Plaintiffs' allegations do not include any comparable statements of intention to perform particular actions in the future.  Unlike the statement in *Herrmann Holdings*, none of the alleged misstatements made in the PPMs are promises of future performances, nor are they dependent on a "timeliness" analysis.  Rather, the alleged misstatements are predicated upon statements of existing material fact.  *See Harden*, 65 F.3d at 1405-06; *Lindelow*, 2001 WL 830956, at *4.

Even if the Court determines that any of the alleged misstatements at issue are "promises of future performance" requiring Plaintiffs to plead fraudulent intent, that requirement has been met.  As Defendants' own authority holds, it is the *speaker's* fraudulent intent that is relevant. *Herrmann Holdings*, 302 F. 3d at 563 (fraudulent intent requires "proof that the speaker knew that the representation was false, or made it without regard to its truth or falsity").  *Accord Dorsey*, 540 F.3d at 343-344.

Although Plaintiffs have properly disclaimed any allegations of fraudulent intent or scienter by the Broker Defendants, Plaintiffs have sufficiently alleged any required fraudulent intent of the actual "speakers"—the Rule 506 Entities, as well as Provident Royalties as a beneficial owner of each Rule 506 Entity (¶ 51) —when making the misrepresentations in the PPMs. (¶¶ 79(j), 86, 88, 91, 92.)  Plaintiffs have alleged, with the particularity required by Rule

9(b), that, in light of the circumstances underlying the alleged misstatements, any "promises" included in the PPMs were made by the Provident Entities "with no intention of performing at the time" they were made. *Herrmann Holdings*, 302 F.3d at 563. Thus, the absence of allegations regarding the Broker Defendants' scienter does not affect Plaintiffs' well-pled claim.

## IV.   PLAINTIFFS HAVE ALLEGED A BREACH OF FIDUCIARY DUTY CLAIM AGAINST THE BROKER DEFENDANTS

There can be no question that the Broker Defendants owed Plaintiffs and the Class fiduciary duties. Texas law is unequivocal: "The relationship between a broker and its customer is that of principal and agent." *Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 492-93 (Tex. App. 1994). And "[t]he relationship between agent and principal is a fiduciary one." *Id.* at 493 n.5; *see also Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc.*, 794 F.2d 198, 200 (5th Cir. 1986); *West v. Touchstone*, 620 S.W.2d 687, 690 (Tex. App. 1981).[19]

As Defendants acknowledge, the determination of the scope of a fiduciary's duties under Texas law is fact-based. *See, e.g., Romano v. Merrill Lynch, Pierce, Fenner & Smith*, 834 F.2d 523, 530 (5th Cir. 1987); *Escalon v. World Group Securities, Inc.*, No. 5:07-CV-214-C, 2008 WL 5572823, at *6 (N.D. Tex. Nov.14, 2008) (denying summary judgment on plaintiff's fiduciary duty claim because of unresolved fact issues). Not surprisingly, Defendants endeavor to characterize the Broker Defendants' duty to Plaintiffs and the Class as limited to "ensuring that all trades made in the plaintiff's account were duly authorized by plaintiff, nothing more." (*See* NEXT Mem. 9.) The facts alleged in the Complaint show that the Broker Defendants

---

[19]   Because Texas law recognizes the relationship between a broker and its customer as a fiduciary one, Plaintiffs are not required to plead the existence of a "special relationship" as the Broker Defendants assert. (Sec. Am. Mem. 18; NEXT Mem. 8-9.) *See, e.g., Lexington Ins. Co. v. North American Interpipe, Inc.*, No. H-08-3589, 2009 WL 1750523, at *3 (S.D. Tex. June 19, 2009) (requiring proof of a "special relationship" because Texas law does not recognize the relationship between an insurance agent and his client to be a fiduciary one).

played a much greater role in the solicitation and sale of Provident Securities than they now choose to admit and, as a result, the duties they owed to Plaintiffs and the Class with respect to Provident Securities extended far beyond the ministerial role of executing trade orders.

Plaintiffs allege that the Broker Defendants were part of a syndicate of broker-dealers who actively solicited investments in Provident Securities. (¶¶ 2, 9, 69, 106.) The Broker Defendants attended product training workshops and conferences, and attended sales presentations held in PAM's offices. (¶¶ 66-67.) Moreover, Plaintiffs allege the Broker Defendants participated in the drafting, preparation, approval, due diligence and/or dissemination of the PPMs that contained false and misleading statements. (¶¶ 2, 9, 64, 65.) And a portion of the $69 million in fees the broker-dealers received for selling the Provident Securities was specifically attributed in the PPMs to "due diligence" the Broker Defendants purportedly performed in connection with the Offerings ostensibly on behalf of their clients. (¶¶ 2, 10, 64, 68.)[20] Indeed, based just on the fact that the Broker Defendants were paid by Plaintiffs for conducting due diligence, they became more than just "mere" order takers. In addition, Plaintiffs specifically allege that each Broker Defendant acted as a fiduciary with respect to the sale of Provident Securities to each named Plaintiff and Class members. (¶¶ 27-33.)

Defendants ignore all of these allegations. Their motions to dismiss the fiduciary duty claim hinge on their unsupported factual assertion that Plaintiffs have "non-discretionary"

---

[20]   *See also* Confidential Private Placement Memorandum for Shale Royalties 17, Inc. (NEXT Ex. A.) at 16 ("The Corporation will pay an 8% sales commission plus a 1% due diligence fee on the amount of subscription proceeds from subscriptions for the Preferred Stock Series A received from the Managing Dealer or through other securities broker/dealers who enter into selling agreements with the Manager Dealer. The Corporation will pay a 5.5% sales commission plus a 1% due diligence fee on the amount of subscription proceeds from subscriptions for the Preferred Stock Series B received from the Managing Dealer or through other securities broker/dealers who enter into selling agreements with the Manager Dealer.").

brokerage accounts.[21] However, merely labeling Plaintiffs' accounts as "non-discretionary" does not relieve the Broker Defendants of all fiduciary duties. The Fifth Circuit has explained that "courts draw no bright-line distinction between the fiduciary duty owed customers regarding discretionary as opposed to nondiscretionary accounts." *Romano*, 834 F.2d at 530. Under Texas law, "[i]t is the duty of a fiduciary to deal openly, and to make full disclosure to the party with whom he stands in such relationship." *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 513 (Tex. 1942). "The law imposes upon the broker the duty to disclose to the customer information that is material and relevant to the order." *Magnum Corp.*, 794 F.2d at 200 (citing *Kinzbach*). "For a broker generally, the fiduciary obligation imposes a duty to recommend securities suitable for the customer. The broker has a duty to provide the customer with all information relevant to the affairs the customer instructed to the broker." *In re Rea*, 245 B.R. 77, 89 (Bankr. N.D. Tex. 2000).

It is these duties—of fair dealing and full disclosure, and to recommend suitable securities to customers—that Plaintiffs allege the Broker Defendants owed and breached. (*See* ¶¶ 106-118; 145-148.) Even if it were true (and alleged) that Plaintiffs' accounts were non-discretionary, a district court (in a case cited favorably by several Texas courts[22] and described as the "leading case" with respect to a broker's duties to a customer with a non-discretionary

---

[21] A non-discretionary brokerage account is one where the broker confers with the investor before making a transaction. A discretionary account is one where the broker has a continuing obligation to manage the investor's account.

[22] *See, e.g., Anton v. Merrill Lynch*, 36 S.W.3d 251, 258 (Tex. App. 2001) (quoting passage explaining a broker's fiduciary duties with respect to a discretionary account); *Rea*, 245 B.R. at 88, 90 (same); *Hand*, 889 S.W.2d at 493-94.

account[23]) confirms that the Broker Defendants owe the following basic fiduciary duties even to investors with nondiscretionary accounts:

> Duties associated with a non-discretionary account include: (1) **the duty to recommend a stock only after studying it sufficiently to become informed as to its nature, price and financial prognosis**; (2) the duty to carry out the customer's orders promptly in a manner best suited to serve the customer's interests; (3) **the duty to inform the customer of the risks involved in purchasing or selling a particular security**; (4) the duty to refrain from self-dealing or refusing to disclose any personal interest the broker may have in a particular recommended security; (5) the duty not to misrepresent any fact material to the transaction; and (6) the duty to transact business only after receiving prior authorization from the customer.

*Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F. Supp. 951, 953 (E.D. Mich. 1978) (internal citations omitted, emphasis added); *see also Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1049-50 (11th Cir. 1987) ("Even though the Gochnauers signed an agreement stating that they understood the risks of option trading, it was incumbent upon Lester to fully explain the risks of options trading and comment on the agreement guaranteeing a 15% return on a speculative investment, a highly unusual arrangement to say the least.").

FINRA Rule 2310 further delineates the Broker Defendants' fiduciary duties to Plaintiffs and the Class. The Rule requires that a registered-broker dealer have a reasonable basis for believing that the investment is suitable for the investor. (¶ 107.) The Northern District of Texas has long allowed securities rules to be used as evidence of the fiduciary duties a broker owes to an investor. *See Lange v. H. Hentz & Co.*, 418 F. Supp. 1376, 1384 (N.D. Tex. 1976) (holding that "NASD Rules may be used as evidence of the present standard of care which the NASD member should achieve ... [and] NASD rules are admissible on the issue of what fiduciary duties are owed by a broker to an investor," even though they do not create a private right of action); *see also Apollo Property Partners, LLC v. Newedge Fin., Inc.*, No. H-08-1803, 2009 WL

---

[23] *See* Robert J. Haft and Peter M. Fass, 4 Tax-Advantaged Securities § 6.163 (2010).

778108, at *2 (S.D. Tex. Mar. 20, 2009) (holding that FINRA/NASD Rule 2310 is "evidence of the standard of conduct by which the actions of brokers are judged for the purpose of negligence actions" but is not a basis for federal jurisdiction).  The cases Defendants cite for the proposition that the FINRA Rule does not create a private right of action are irrelevant, since Plaintiffs cite the Rule not as a separate cause of action, but only as further explanation of the duties the Broker Defendants owe Plaintiffs and the Class.  (*See* NEXT Mem. 6-7.)

Defendants cite cases in which courts have stated that a "non-discretionary account" requires nothing more from the broker than the faithful execution of the investor's orders, but none of Defendants' cases involved the type of broker-investor relationship alleged in this case, where the Broker Defendants solicited Plaintiffs' and the Class' investments in the Provident Securities; participated in the drafting, preparation, approval, due diligence and/or dissemination of various materially false and misleading statements in the PPMs; and were paid to perform due diligence of the securities. (¶¶ 2, 9-10, 64-69.)

Moreover, the determination of whether or not an account is discretionary or non-discretionary cannot be resolved on a motion to dismiss based solely on Defendants' bald assertion of facts not before the Court.  *See, e.g., Hand*, 889 S.W.2d at 492 (on summary judgment, weighing broker's affidavit and deposition testimony of investor's father, along with investor's admission that she did not know the nature of her account, to determine whether investor's account was non-discretionary or discretionary).   In that regard, the Brokers Defendants' cases are also distinguishable because they were decided on summary judgment or at trial, after full development of the facts confirmed that the broker's duty was "confined to executing the orders he or she has accepted from the customer." *Tapia v. Chase Manhattan Bank, N.A.*, No. EP-93-CA-334-F 1997 U.S. Dist. LEXIS 23210, at *28 (W.D. Tex. May 9,

1997) (on summary judgment), *aff'd*, 149 F.3d 404 (5th Cir. 1998); *see also Romano*, 834 F.2d at 530 (affirming district court's dismissal following trial); *Edward D. Jones & Co. v. Fletcher*, 975 S.W.2d 539, 545 (Tex. 1998) (reversing judgment for plaintiff following jury trial); *Western Reserve Life Assur. Co. v. Graben*, 233 S.W.3d 360, 374 (Tex. App. 2007) (affirming judgment for plaintiff after jury); *Hand*, 889 S.W.2d at 493 n.5 (affirming summary judgment).

Regardless of the type of account, the Broker Defendants are liable. Defendants' cases highlight the principal distinction between discretionary and non-discretionary accounts: the *duration* of the broker's duties to the investor. "As a general proposition, a broker's duty in relation to a nondiscretionary account is complete, and his authority ceases, when the sale or purchase is made and the receipts therefrom accounted for." *Hand*, 889 S.W.2d at 493-494; *see also Tapia v. Chase Manhattan Bank, N.A.*, 149 F.3d 404, 412 (5th Cir. 1998) (holding that the statute of limitations for breach of fiduciary duty started to run at the time of the investor's purchase, when the broker provided the investor with the information he claimed was not disclosed). This distinction is not relevant to Plaintiffs' breach of fiduciary duty claim, which is based on duties the Brokers Defendants undertook and owed at the time they solicited Plaintiffs' and the Class' purchases of Provident Securities. (*See* ¶¶ 11, 65, 106-18.) As the Second Circuit has explained, "[o]n a transaction-by-transaction basis, the broker owes duties of diligence and competence in executing the client's trade orders, and is obliged to give honest and complete information when recommending a purchase or sale. The client may enjoy the broker's advice and recommendations with respect to a given trade, but has no legal claim on the broker's ongoing attention." *de Kwiatkowski v. Bear, Stearns & Co., Inc.*, 306 F.3d 1293, 1302 (2d Cir. 2002).

Finally, Defendants cite several irrelevant fiduciary duty cases that do not involve broker-investor relationships, most of which, in any event, were also decided after discovery. *See Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (affirming judgment for plaintiff company on fiduciary duty claim because sufficient evidence supported jury verdict for the company against former employees, who breached their fiduciary duty by, among other things, disclosing confidential information to the company's competitors and soliciting the company's employees); *Lexington Ins. Co.*, 2009 WL 1750523, at *3 (dismissing defendant's third-party claim for breach of fiduciary duty because Texas does not recognize the relationship between insurance agent and client as a fiduciary relationship and the plaintiff had not plead a "special relationship" that transformed the arms-length transaction into a fiduciary duty); *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App. 2003) (affirming judgment for defendant employee because the jury could reasonably have concluded that employee did not solicit co-workers in breach of his fiduciary duty to his employer); *Thompson v. Vinson & Elkins*, 859 S.W.2d 617 (Tex. App. 1993) (affirming summary judgment for law firm because an attorney cannot represent an estate or a trust, or the beneficiary of a trust and an attorney representing a trustee).

In short, the allegations of the Complaint are sufficient to state a plausible claim for Broker Defendants' breach of fiduciary duty to investors in Provident Securities regardless of whether the account was discretionary or non-discretionary. As Plaintiffs have alleged facts supporting the nature of the Broker Defendants' fiduciary duties to Plaintiffs and investors, facts demonstrating the manner in which the Broker Defendants breached their fiduciary duties to Plaintiffs, and the resulting damages, Broker Defendants' motion should be denied.

## V.    PLAINTIFFS HAVE ALLEGED CONTROL PERSON LIABILITY AGAINST THE CONTROL PERSON DEFENDANTS

The TSA holds a "control person" liable for any violation of TSA Article 581-33 by the controlled seller of securities:

> A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

TSA Article 581-33F.   The seller and the control person are jointly and severally liable for a violation of TSA Article 581-33(A).   *See, e.g.*, *Gonzalez v. Morgan Stanley Dean Witter, Inc.*, No. SA-03-CA-901-H, 2004 U.S. Dist. LEXIS 26709, at *6 (W.D. Tex. July 13, 2004), *aff'd* 2006 U.S. Dist. LEXIS 17317 (5th Cir. 2006).   "The comment to 33F(1) states, 'The rationale for control person liability is that a control person is in a position to prevent the violation and may be able to compensate the injured investor....'" *In re Enron Corp. Sec., Derivative & ERISA Litig*, 258 F. Supp. 2d 549, 607 (S.D. Tex. 2003) (citing, TSA Article 581-33, cmt. at 84 (Vernon's Supp. 2002)).[24]

The Control Person Defendants contend that Plaintiffs failed to adequately plead primary violation claims against the Broker Defendants under Article 581-33(A)(2), and therefore the control person claim must fail.   (Ameriprise Mem. 5; NEXT Mem. 19.) They are wrong.   As set

---

[24]   The court in *Enron* went on to find that plaintiffs had set forth sufficient allegations to state a control person claim and denied the motion to dismiss, stating that the defendant's objections to the control person claim "may more appropriately be raised on summary judgment after discovery." *Id.* at 649.

forth above, Plaintiffs have adequately pled the elements of the primary violation claim against each of the Broker Defendants.[25]

In addition, all of the Control Person Defendants have moved to dismiss these claims asserting that the Complaint lacks sufficient allegations to hold the Control Person Defendants liable under the TSA. (Ameriprise Mem. 3-8; CapFin Mem. 4; CapWest Mem. 3-4; Natl Sec. Mem. 4-5; NEXT Mem. 19-22; QA3 Mem. 3-4.) As discussed below, once again Defendants are wrong.

Although "[t]he TSA does not define 'control person'…Texas courts have determined that 'control' is to be 'used in the same broad sense as in federal securities law' and means 'the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through ownership of voting securities, by contract, or otherwise.'" *Barnes v. SWS Fin. Servs.*, 97 S.W.3d 759, 763 (Tex. App. 2003) (quoting 581-33(F) cmt.); *see also Trendsetter Investors, LLC v. Hyperdynamics Corp.*, No. H-06-0746, 2007 WL172627, at *26-27 (S.D. Tex. Jan. 18, 2007) ("Congress envisioned a broad definition of control: '[W]hen reference is made to 'control,' the term is intended to include actual control as well as what has been called legally enforceable control…. It was thought undesirable to attempt to define the term. It would be difficult if not impossible to enumerate or to anticipate the many ways in which actual control may be exerted. A few examples of the methods used are stock ownership, lease, contract, and agency.'") (quoting H.R. Rep. No. 1383, 73rd Cong., 2d Sess. 26 (1934)).

Texas courts hold that "a defendant is a control person under the TSA if it (1) exercised control over the operations of the corporation in general and (2) had the power to control the

---

[25] Even absent the primary violation claim, control person claims may be allowed to proceed. *See, e.g., In re Enron Corp Sec., Derivative & ERISA Litig.*, No. MDL 1446, H-01-3624, 2005 WL 1637914, at *3-4 (S.D. Tex. June 20, 2005).

specific transaction or activity upon which the primary violation is predicated." *Barnes*, 97 S.W.3d at 763 (citing *Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380, 384 (Tex. App. 2000)). Defendants have referred to this standard as the "*Frank* test." (NEXT Mem. 20-21.)   They further assert that Texas courts apply two different standards for determining control person liability, citing *Texas Capital Secs. Mgm't, Inc. v. Sandefer*, 80 S.W. 3d 260, 268 (Tex. App. Texarkana 2002), which applied a higher standard requiring the plaintiff to prove that the defendant "induced or participated in the alleged violation."   (NEXT Mem. 20-21; Ameriprise Mem. at 5-8.)   However, the *Sandefer* test was adopted from the Fifth Circuit's decision in *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990).   The Fifth Circuit has since found that "*Dennis* does not accurately reflect our rejection . . .  of a 'culpable participation' requirement." *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 620 (5th Cir. 1993).

Subsequent decisions have similarly rejected the *Sandefer* test. *See, e.g. Gonzalez*, 2004 U.S. Dist. LEXIS 26709, at 11 (rejecting application of *Sandefer* test concluding that the *Frank* standard "is more in line with the aims and specifications of the TSA" and comports with current Fifth Circuit law); *Barnes*, 97 S.W.3d at 764 (observing that "the Fifth Circuit has specifically held that the federal statute does not 'require participation in the wrongful transaction'" because "'[l]ack of participation and good faith constitute an affirmative defense for a controlling person,'" and that the TSA similarly "places the burden of proof as to the issue of control on the plaintiff and the burden of proof for establishing good faith on the defendant") (quoting *G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981);[26] *Hagerty Partners P'ship v. Livingston*, 128 S.W.3d 416, 421 (Tex. App. 2004) (applying the *Frank* standard and

---

[26]   Thus, even if this Court were to utilize the disfavored *Sandefer* test, the allegations in the Complaint would still suffice because "culpable participation" is an affirmative defense.

citing *Barnes*); *Newby v. Enron Corp. (In re Enron Corp. Sec. Litig.)*, Civ. Action No. H-01-3624, 2004 WL 764664, at *5 (S.D. Tex. Mar. 31, 2004) (applying Sections 15 and 20(a), "the Fifth Circuit has expressly rejected more stringent requirements such as actual participation in the primary violation and/or the actual exercise of the controlling person's power to control," upholding claims against parent holding company).

Defendants ignore the fact that all of the Control Person Defendants are *parent companies* of the Broker Defendants. (¶¶ 35-41.) Courts in the Fifth Circuit have held that for pleading purposes, allegations identifying the alleged primary violator as a wholly-owned subsidiary of the parent company defendant are generally sufficient to show the power to control or influence the subsidiary. *See Trendsetter*, 2007 WL 172627, at *26; *In re Enron Corp Sec., Derivative & ERISA Litig.*, No. MDL 1446, H-01-3624, 2004 WL 3410449, *3 (S.D. Tex. Apr. 6, 2004).

Moreover, Plaintiffs allege that the Control Person Defendants "directly and/or indirectly controlled the Broker Defendants" within the meaning of Article 581-33F(1) of the TSA, and further allege that each Control Person Defendant "exercised control over the management, policies and operations of its subsidiary Broker Defendant and had the power to control the specific transactions and/or activities" that form the basis of the Broker Defendants' primary violations of the TSA. (¶141.) Plaintiffs also allege that each of the Control Person Defendants "had the ability to prevent its subsidiary Broker Defendant from acting as a seller" of Provident Securities, had "direct and supervisory involvement in and/or knowledge of the day-to-day operations of its subsidiary Broker Defendant" and "had the power to control or influence the

particular transactions giving rise to the securities violations as alleged herein, and exercised" that power.  (¶142.)[27]

The Complaint includes the following specific allegations about each Control Person Defendant:

• Ameriprise offers financial planning, products and services to individual and institutional investors, and distributes its products through Securities America, its wholly owned broker-dealer subsidiary.  Ameriprise owns 100% of Securities America, and controls and has the ability to direct Securities America's management and policies. In addition, Ameriprise and Securities America share common management, including Walter S. Berman, who serves as Ameriprise's Chief Financial Officer and is a Director of Securities America. (¶35.)[28]

• Capital Holdings offers investment products and services to independent investment representatives, financial planners and investment advisers through Capital Financial, its wholly-owned subsidiary.  Capital Holdings owns 100% of Capital Financial, and controls and has the ability to direct Capital Financial's management and policies.  Capital Holdings and Capital Financial share the same address and phone number.  They also share common management personnel, including Bradley P. Wells (President, Chief Executive Officer and

---

[27] Despite the Control Person Defendants' protestations (Ameriprise Mem. 7), Plaintiffs' allegations as to all Control Person Defendants in ¶¶ 141 and 142 are sufficient because they are all alleged to have the similar power and scope of control.  This is completely different from the facts in *Floyd v. CIBC World Markets, Inc.*, No. H-08-3048, 2009 WL 2633791, at *3 (S.D. Tex. Aug. 25, 2009) (plaintiffs failed to plead any facts whatsoever as to a particular defendant and merely alleged joint wrongdoing).

[28] Ameriprise argues that it is "an indirect parent of Securities America." (Ameriprise Mem. at 7 n.2.)  But this purported fact is irrelevant because Ameriprise acknowledges that it wholly owns the intermediate subsidiary, which in turn wholly owns Securities America. *See, e.g., In re BP Prudhoe Bay Royalty Trust Sec. Litig.*, C06-1505, 2007 WL 3171435, at *1, *8 (W.D. Wash. Oct., 26, 2007) (control person status established against parent of "an indirect wholly-owned subsidiary").

Chief Financial Officer of Capital Holdings and Director and Treasurer of Capital Financial);

Jacqueline L. Case (Vice President of Corporate Strategy of Capital Holdings and Vice President

and Secretary of Capital Financial); and Vance C. Castleman (Director of both Capital Holdings

and Capital Financial). (¶ 36.)

- GunnAllen Holdings provides securities brokerage, securities trading, investment banking, and money management services through its subsidiary, GunnAllen. GunnAllen Holdings owns 75% of GunnAllen, and thus controls and has the ability to direct GunnAllen's management and policies. GunnAllen Holdings and GunnAllen share the same address and phone number. Until April of 2009, GunnAllen Holdings and GunnAllen shared the same Chief Executive Officer, Gordon Loetz. (¶38.)

- National Holdings provides independent brokerage, advisory services and asset management services through National Securities, its subsidiary. National Holdings owns 75% of National Securities, and controls and has the ability to direct National Securities' management and policies. National Holdings and National Securities share the same address and phone number. They also share common management: Mark Goldwasser serves as Chief Executive Officer of both National Holdings and National Securities. (¶ 39.)

- NEXT Holdings provides financial services through NEXT, its subsidiary. NEXT Holdings owns 75% of NEXT, and controls and has the ability to direct NEXT's management and policies. NEXT Holdings and NEXT share the same address and phone number. They also share common management, including Gordon D'Angelo (Chairman and Chief Executive Officer of both NEXT Holdings and NEXT), and Norm Grant, David Holz and Arthur Farr (all of whom serve as Directors for both NEXT Holdings and NEXT). (¶ 40.)

- Defendant QA3, LLC provides financial services through its subsidiary QA3. QA3, LLC owns 75% of QA3, and thus controls and has the ability to direct QA3's management and policies. QA3, LLC and QA3 share the same address and phone number. They also share common management, including Stephen K. Wild (Executive Officer of QA3, LLC and Chairman of QA3); and Nancy Drennen (Executive Officer of QA3, LLC and Vice President and Chief Marketing Officer of QA3). (¶ 41.)

- Capstone provides financial services, owns at least 75% of CapWest and directs CapWest's management or policies. (¶ 37.)

Thus, as in *Trendsetter* and *Enron*, the allegations in the Complaint are sufficient to show that "the pleader is entitled to relief" under Rule 8(a). *Enron*, 2004 WL 3410449, at * 3.[29]

The Control Person Defendants fail to provide any support for a finding that allegations concerning the Control Person Defendants as parent companies of Broker Defendant subsidiaries are not sufficient to survive their motions to dismiss. Instead, in support of their motions to dismiss, the Control Person Defendants cite to the analysis in TSA cases involving the relationship of certain officers, directors and/or employees to a corporation for purposes of establishing whether or not those individuals can be found to be control persons. *See Gonzalez*, 2004 U.S. Dist. LEXIS 26709 at *7-11 (on summary judgment, finding that plaintiff had not

---

[29]   Courts in the Southern District of New York, where the applicable standard is at least as rigorous as it is here, have also have found adequate pleading of control person liability in cases involving parent companies of subsidiary controlled parties with similar allegations. *See, e.g. Pollack v. Laidlaw Holdings, Inc.*, No. 90 Civ. 5788 (BAC), 1995 WL 261518, at *18 (S.D.N.Y. May 3, 1995) ("In this case, Laidlaw Holdings controlled both Laidlaw Equities and Laidlaw Asset Management through one hundred percent stock ownership and through common officers and directors. Accordingly, plaintiffs have provided prima facie evidence of Laidlaw Holdings' status as a controlling person."). *See also, In re Global Crossing, LTD Sec. Litig.*, No. 02 Civ. 910(GEL), 2005 WL 1875445, at *4 (S.D.N.Y. Aug. 5, 2005) (citing "persuasive authority in which courts have sustained Section 15 claims against a parent corporation for the acts of a subsidiary").

proffered evidence that a regional manager controlled an account executive); *Hagerty Partners*, 129 S.W.3d at 421 (addressing jurisdiction over board members of company located in Texas with no analysis of control person liability under TSA); *Sandefer*, 80 S.W.3d at 268 (whether officers and directors were control persons).[30] It is in connection with these cases that courts consider the status of the individual to whom control person liability is alleged – not, like here, in the context of control over a wholly-owned or majority-owned subsidiary company.[31]

In sum, Plaintiffs have adequately pled their control person claim. Accordingly, the Control Person Defendants' motion should be denied.

## VI. PLAINTIFFS REQUEST LEAVE TO AMEND ANY PORTION OF THE COMPLAINT THAT IS DISMISSED BY THE COURT

Plaintiffs hereby request that, should the Court grant Defendants' motions to dismiss in any part, it grant them leave to amend the Complaint. Pursuant to Rule 15(a)(2), "[t]he court should freely give leave when justice so requires." Indeed:

> The Federal Rules of Civil Procedure set forth a liberal policy in favor of permitting amendment of pleadings, and district courts are not to deny such

---

[30] Defendants also cite to non-TSA cases which similarly involved the relationships of individuals to a corporation. *See*, NEXT Mem. 19-22 (citing to *G.A. Thompson & Co.,* 636 F.2d at 958 (whether officer was a control person); *Copland v. Grumet*, No. Civ.A. 96-3351 1998 WL 256654 at *16 (D.N.J. Jan. 9, 1998) (whether former director was control person); *Starr v. !hey*, No. 01 C 6087, 2003 WL 21212596, at *4 (N.D. Ill. May 23, 2003) (whether senior managers, directors or shareholders were control persons); *Zagami v. Natural Health Trends Corp.*, 540 F. Supp. 2d 705, 716 (N.D. Tex. 2008) (whether officers and directors were control persons). *See also*, Ameriprise Mem. 7 (citing *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 913 (S.D. Tex. 2004) (whether officers and directors were control persons).

[31] In fact, some of the Control Person Defendants' own cases actually support a finding that Plaintiffs' Complaint is adequately pled. *See Starr*, 2003 WL 21212596, at *4 (dismissing control person claims for failing to plead *any* facts other than the fact that defendants were shareholders, but identifying examples where control person liability was properly pled: "For example, a plaintiff sufficiently pleaded control person liability where the complaint alleged that the defendant was *the majority shareholder* (and therefore had control over the directors)" (emphasis added)); *In re Enron Corp. Sec. Derivative & ERISA Litig.*, No. MDL-1446, H-01-3624, 2004 WL 764664, at *6 (S.D. Tex. Mar. 31, 2004) (finding complaint adequately pled control person claim as to parent subsidiary).

amendment absent a "substantial reason" to do so…Indeed, the Fifth Circuit has long recognized that the Federal Rules "evince[] a bias in favor of granting leave to amend."

*Timberlake v. Synthes Spine, Inc.*, No. V-08-4, 2010 WL 743927, at *2 (S.D. Tex. Feb. 25, 2010) (citing *Dussouy v. Gulf Coast Inv. Corp.*, 660 F. 2d 594, 598 (5th Cir. 1981)) (remaining citations omitted).  Moreover, none of the factors weighing against granting leave to amend – undue delay, bad faith or dilatory motive, repeated failures to cure deficiencies through previous amendments, undue prejudice to Defendants, or futility – are present here.  *Id.*  Thus, Plaintiffs should be permitted to amend any portions of the Complaint that the Court finds deficient.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss.

Dated: March 22, 2010

**ZWERLING, SCHACHTER & ZWERLING, LLP**

By: /s/ Richard A. Speirs
Susan Salvetti
Richard A. Speirs
Sona R. Shah
David R. Kromm
41 Madison Avenue
New York, NY 10010
Tel: 212-223-3900

Dan Drachler
**ZWERLING, SCHACHTER & ZWERLING, LLP**
1904 Third Avenue, Ste. 1030
Seattle, WA 98101-1170
Tel: 206-223-2053

Daniel C. Girard
Jonathan K. Levine

Amanda M. Steiner
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Tel: 415-981-4800

*Interim Co-Lead Plaintiffs' Counsel*

Lewis T. LeClair (SBN 12072500)
**McKOOL SMITH, P.C.**
300 Crescent Court, Ste. 1500
Dallas, Texas 75201
Tel: 214-978-4984
Fax: 214-978-4044
lleclair@mckoolsmith.com

*Liaison Plaintiffs' Counsel*

Ari H. Jaffe
**KOHRMAN JACKSON**
        **& KRANTZ, PLL**
One Cleveland Center, 20th Floor
Cleveland, OH 44114
Tel: 216-696-8700

Jeffrey W. Chambers
**WARE JACKSON LEE**
        **& CHAMBERS LLP**
America Tower
2929 Allen Pkwy
Houston, Texas 77019
Tel: 713-659-6400

David M. Foster
**DAVID M. FOSTER, P.C.**
30833 Northwestern Highway, Ste. 209
Farmington, Hills, MI 48334
Tel: 248-855-0940

*Plaintiff's Counsel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was filed on the court's CM/ECF system and was hereby made available to counsel of record on this 22nd day of March, 2010.

By: /s/ Richard A. Speirs
Richard A. Speirs